Filed 11/10/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| JABARI JUMAANE, | B255763 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC294248) |
| v. | |
| CITY OF LOS ANGELES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Mel Red Recana, Judge. Reversed and remanded.

Michael N. Feuer, City Attorney, Vivienne A. Swanigan, Assistant City Attorney, and Jennifer Handzlik, Deputy City Attorney, for Defendant and Appellant.

Nana Gyamfi for Plaintiff and Respondent.

\* \* \* \* \* \*

Defendant, the City of Los Angeles (City), appeals from the trial court's order denying the City's motion for judgment notwithstanding the verdict following the second trial of plaintiff Jabari Jumaane's employment claims. We conclude most of plaintiff's claims are barred by the statute of limitations, and the evidence of events within the limitations period was insufficient to establish a prima facie case of disparate impact discrimination, harassment or retaliation. The City's motion should have been granted in its entirety. Thus, we reverse the judgment and remand for entry of judgment in favor of the City.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. The First Trial and Appeal

Plaintiff, an African-American, has been employed with the City through his work with the Los Angeles Fire Department (Department) since 1986. He sued the City on April 18, 2003, alleging racial discrimination, racial harassment, and retaliation. At the first trial, the jury rendered a verdict in favor of the City on all causes of action. The trial court granted plaintiff's motion for new trial based on juror misconduct, and we affirmed in an unpublished opinion filed August 5, 2010. (*Jumaane v. City of Los Angeles* (B204553) (*Jumaane I*).)

In that opinion, we rejected the City's argument that even if there was jury misconduct, plaintiff was not harmed because the City was entitled to judgment as a matter of law. The City contended plaintiff failed to file a complaint with the Department of Fair Employment and Housing (DFEH) within one year of any adverse employment action (Gov. Code, § 12960, subd. (d)), and thus, he could not bring his lawsuit. We found plaintiff's DFEH complaint was timely, because it was filed on April 16, 2002, and plaintiff suffered an adverse employment action when he was suspended for 15 days from April 16 through April 30, 2001.

### 2. The Retrial From Which this Appeal Is Taken

At the time of his second trial in 2013, plaintiff was a Firefighter Level III with the Department, having been continuously employed with the Department since February 3,

2

1986.  In addition to being a Firefighter, plaintiff held the position of Inspector from 1990 through April 2001.

The case was retried over the course of 34 court days between September 23 and November 25, 2013.  At the end of the second trial, the jury found for plaintiff on the causes of action for race discrimination based on a disparate impact theory, race harassment, retaliation for complaining about discrimination and harassment, and failure to prevent discrimination, harassment or retaliation.  The jury found for the City on the cause of action for disparate *treatment* race discrimination.  The jury found that plaintiff's race was not a substantial motivating reason for the City's treatment of plaintiff.  The jury awarded plaintiff over $1 million in compensatory damages.  The City moved for judgment notwithstanding the verdict, which the trial court denied.

The motion for judgment notwithstanding the verdict was based in part on the City's statute of limitations defense.  The City argued that the evidence of events that occurred before April 16, 2001, was not part of a continuing violation of the Fair Employment and Housing Act (FEHA; Gov. Code, § 12940 et seq.), and the evidence of events on and after April 16, 2001, was insufficient to prove disparate impact discrimination, harassment or retaliation.

We now summarize the evidence that was before the jury.

### A.    Plaintiff's protected activities preceding the adverse employment actions

In 1991, plaintiff wrote a letter to the City Council on behalf of a professional organization of African-American firefighters protesting racism.  In 1994, plaintiff gave an interview as part of a survey conducted by the City Personnel Department regarding racial issues in the Department.  Also in 1994, plaintiff testified to racism in the Department at a hearing of the City Council.  In 1996, plaintiff filed a union grievance alleging racism in the requirements to use the weight room in the basement at City Hall East.  As a result of his grievance, plaintiff testified that "funding was provided, the size of the weight room was tripled, brand new equipment was provided and it was more

3

separate but equal then." In 1997, plaintiff gave deposition testimony about race discrimination in the Department in a lawsuit brought by another Department employee.

Sometime in 1999 or 2000, plaintiff filed two complaints with the Department alleging that Assistant Fire Marshal Michael Fulmis, who was in plaintiff's line of command, made two "inappropriate" and "culturally insensitive" comments in his presence. The first comment was made while Assistant Fire Marshal Fulmis was watching protestors outside the window. He said, "I guess turning a water hose on them wouldn't be the thing to do right now." The second comment was made after plaintiff brought a water bottle to replenish the water cooler in his unit. Assistant Fire Marshal Fulmis said, "Oh, so you are the water boy."

## B. The adverse employment actions taken against plaintiff in 1999 and 2001

Plaintiff was suspended for 10 days in 1999. He was suspended for 15 days in 2001. There is no dispute the suspensions were adverse employment actions. The City provides record citations to the following evidence concerning the two suspensions. (Plaintiff provided almost no record citations in his respondent's brief, as discussed further below.)

### i. The 1999 suspension

The first suspension related to events in 1998. Plaintiff had been assigned to the Central Industrial Unit (CIU) but was temporarily reassigned starting on May 18, 1998, to assist the 1998 Brush Task Force. However, plaintiff continued to report for duty at the CIU; he did not report for duty at the Brush Task Force until June 2, 1998. Plaintiff was asked to document his activities between May 18 and June 2, 1998. The Department was not satisfied with his report and requested more information. Plaintiff provided a second report but the Department still considered it incomplete. When the captain in charge of the Brush Task Force met with plaintiff to discuss what specific information should be included in a third report, plaintiff tried to tape-record their conversation and refused to turn off the tape recorder when told to do so. Plaintiff did not appear for

4

subsequently scheduled meetings with Department supervisors. He submitted a third report which the Department still considered to be incomplete.

The Department then conducted an audit of plaintiff's inspection records. The audit found documentation supporting an inadequate number of inspections. Plaintiff was asked to produce documents to refute the audit findings. He was unable to do so.

In September 1998, plaintiff was placed on a six-month interim evaluation during which his performance was subject to monthly evaluations by his unit commander. On September 24, 1998, plaintiff received an unsatisfactory interim evaluation. Plaintiff filed a grievance, which was denied.

In September and October 1998, plaintiff received six written reprimands for missing work or being tardy. He filed grievances with respect to each reprimand, and each grievance was denied.

Plaintiff was also asked to provide more written reports of his activities. He told his supervisors that, from his perspective, "it was clear a paper trail was being created for purposes of justifying some sort of discipline." He did not state in his reports that he believed the Department was discriminating and retaliating against him. However, he did tell his union representative, Mike McOsker, that the frequent requests for reports of his activities were "racial discrimination and result of retaliation."

On October 25, 1998, plaintiff was transferred to the Hydrants and Access Unit (HAU). Plaintiff formally grieved his transfer to a new unit on December 17, 1998. He testified that when he was transferred, he felt the transfer was "punitive and racially motivated." The grievance was denied.

In November 1998, one of plaintiff's supervisors requested that the Department conduct a personnel investigation of plaintiff's work activities. The March 31, 1999 report on the investigation recommended a pre-disciplinary hearing be conducted and that a suspension be imposed.

Plaintiff was served with formal notice of the proposed disciplinary action on April 13, 1999. (As a tenured employee, plaintiff had rights to notice and an opportunity to respond to a proposal to impose disciplinary action under *Skelly v. Personnel Board*

5

(1975) 15 Cal.3d 194, 215 (*Skelly*).) A formal *Skelly* meeting was held on April 27, 1999, followed by issuance of a complaint charging five counts of misconduct by plaintiff had been sustained. The misconduct included failing to report for duty at the Brush Task Force, failing to maintain records of his inspection activities, failing to provide his supervisors with requested documents on two separate occasions, and insubordination for refusing to turn off the tape recorder.

The Fire Chief approved a 10-day suspension. Plaintiff did not request a Board of Rights hearing to challenge the suspension. He served the suspension in June 1999. Plaintiff testified he "absolutely" believed the Department was discriminating against him and that, after he finished serving his suspension, he no longer had any hope "that somebody would listen to reason and not be tainted."

### ii. The 2001 suspension

At his request, plaintiff was added to the on-call inspector assignment at the HAU on February 29, 2000. The on-call assignment requires the inspector to take the HAU's on-call emergency vehicle home (home-garage) so that he can respond quickly in case of an emergency. The vehicle is equipped with a special Department of Water and Power (DWP) radio to enable the inspector to communicate with DWP personnel about water delivery while en route to the scene.

Plaintiff was assigned as on-call Inspector on March 8, 2000. Instead of home garaging the on-call vehicle, plaintiff left it in the City Hall East parking structure, in an unauthorized area, because of his obligations to attend a series of community meetings during "off-duty" hours. At trial, plaintiff denied his supervisor told him to take the vehicle home on March 8, 2000. At the time, however, plaintiff's supervisor gave plaintiff a written reprimand for insubordination for intentionally violating a directive to take home the on-call vehicle.

Plaintiff was served with a formal *Skelly* notice of a proposed 15-day suspension on April 7, 2000. A *Skelly* meeting was initially scheduled for May 3, 2000. However, plaintiff was off work due to an on-duty injury from May 2000 through March 25, 2001. The meeting was rescheduled several times at plaintiff's request. On January 31, 2001,

the Department sent plaintiff a letter telling him the meeting had been scheduled for February 15, 2001, and that if he could not attend in person, he could submit his response in writing, allow his union representative to speak on his behalf, or submit an audiotape or videotape. Later, the Department offered "to take the *Skelly* Hearing to [plaintiff] at his home." Plaintiff testified he did not remember being offered the options in the letter, but he did recall his union representative presented the option of meeting at his home.

The *Skelly* meeting was held on February 15, 2001. Plaintiff did not attend but his union representative was present. Two counts of misconduct were sustained, and the Fire Chief approved a 15-day suspension, to be served from March 5 to 19, 2001. Plaintiff requested a Board of Rights hearing on March 5, 2001, but he then withdrew his request on April 2, 2001. On March 26, 2001, plaintiff had returned to duty following his time off for the on-duty injury. He served the suspension from April 16 to April 30, 2001.

After plaintiff had withdrawn his request for a Board of Rights hearing, he wrote a letter to the Fire Commission on April 5, 2001, reporting that the Department denied his request for a Department vehicle on April 3, 2001, based on his race and in retaliation for previous complaints of discrimination. The Department submitted a response, denying the allegations. A few days later, on April 11, 2001, plaintiff wrote another letter to the Fire Commission, asking to revert to the position of firefighter due to "the climate of racial harassment and discrimination" in the rank of inspector.

Plaintiff filed his DFEH complaint on April 16, 2002, alleging the June 1999 and April 2001 suspensions were discriminatory, retaliatory and harassing "as a result of my exercising my right to fight racism and discrimination with the . . . Department."

Plaintiff's request for reassignment was approved and in ensuing years, plaintiff was promoted to Firefighter Level III.

**DISCUSSION**

A.    **Standard of Review**

"A motion for nonsuit or demurrer to the evidence concedes the truth of the facts proved, but denies as a matter of law that they sustain the plaintiff's case. A trial court may grant a nonsuit only when, disregarding conflicting evidence, viewing the record in

7

the light most favorable to the plaintiff and indulging in every legitimate inference which may be drawn from the evidence, it determines there is *no* substantial evidence to support a judgment in the plaintiff's favor."  (*Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 27-28 (*Edwards*).)  Our review is de novo.  (*Baker v. American Horticulture Supply, Inc*. (2010) 185 Cal.App.4th 1295, 1308 (*Baker*).)

**B.      The City Had a Viable Statute of Limitations Defense**

A plaintiff suing for violations of FEHA ordinarily cannot recover for acts occurring more than one year before the filing of the DFEH complaint.  (Gov. Code, § 12960, subd. (d); *Richards v. CH2M Hill, Inc.* (2001) 26 Cal.4th 798, 822-823 (*Richards*) ["[P]ermitting an employee *indefinitely* to delay the filing of a lawsuit . . . would be contrary to the FEHA's statute of limitations and potentially prejudicial to the employer."].)  Plaintiff filed a DFEH complaint on April 16, 2002.  Thus, plaintiff could not recover for acts occurring before April 16, 2001, unless the continuing violation doctrine applies.

"[W]hen an employer engages in a continuing course of unlawful conduct under the FEHA by refusing reasonable accommodation of a disabled employee or engaging in disability harassment, and this course of conduct does not constitute a constructive discharge, the statute of limitations begins to run, not necessarily when the employee first believes that his or her rights may have been violated, but rather, *either* when the course of conduct is brought to an end, as by the employer's cessation of such conduct or by the employee's resignation, *or* when the employee is on notice that further efforts to end the unlawful conduct will be in vain."  (*Richards*, *supra*, 26 Cal.4th at p. 824.)

In *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, the Supreme Court clarified that the continuing violation doctrine applies not only to FEHA harassment and discrimination claims but also to retaliation claims.  (*Yanowitz*, at p. 1142 ["We believe the better rule is to allow application of the continuing violation doctrine in retaliation cases if the requisite showing of a continuing course of conduct has been made.  Thus, we reiterate that in a retaliation case, as in a disability accommodation or harassment case,

8

the FEHA statute of limitations begins to run when an alleged adverse employment action acquires some degree of permanence or finality."].)

The City has consistently asserted the statute of limitations defense to plaintiff's claims, most of which rest on events that took place in the 1990's. The City moved for summary judgment on this basis in 2004. The court denied the motion by order dated March 11, 2005, but then granted the motion as to all the individually named defendants after the City sought a writ, and this court issued notice of our intention to issue a peremptory writ directing the trial court to grant summary judgment in favor of the individual defendants (but not the City).

The City asserted the statute of limitations defense at the first trial and on appeal from the grant of plaintiff's motion for new trial after the first trial. The City again developed the statute of limitations defense at the retrial and asked the court to give the CACI instruction on the continuing violation doctrine. (See CACI No. 2508.)

The trial court refused to give the requested instruction. The court incorrectly reasoned that it had already decided the continuing violation doctrine applied when the court denied the City's motion for summary judgment in 2005. The court also incorrectly reasoned that this court "made the same finding about the DFEH complaint," apparently referring to our opinion of August 5, 2010, discussed *ante*. This was manifest error.

The denial of summary judgment only means there are triable issues of material facts. At a jury trial, the facts are presented and the jury must decide whether there was a continuing course of unlawful conduct based on the law as stated in CACI No. 2508. (*Birschtein v. New United Motor Manufacturing, Inc.* (2001) 92 Cal.App.4th 994, 1006 [reversing summary judgment on statute of limitations in sex harassment case, explaining that "plaintiff presented sufficient evidence to survive defendant's motion for summary judgment; whether a properly instructed jury would conclude plaintiff's evidence was sufficient as a matter of fact to establish a continuing violation and support an award of damages outside the limitations period remains an open question"].)

And this court has never made a finding that the continuing violation doctrine applies to plaintiff's claims. In our previous opinion, we simply found "that since

9

[plaintiff's] suspension ended on April 30, 2001, he had until at least one year from that date to file a DFEH complaint. Therefore, the DFEH complaint filed April 16, 2002, was timely." (*Jumaane I, supra,* B204553.) We said nothing at all about any adverse employment action preceding the April 2001 suspension.

The trial court prejudicially erred in finding that the continuing violation doctrine necessarily applied to the case, removing the matter from the jury's consideration.

**C.     Accepting as True that the Events in the 1990's Show Race Harassment and Retaliation for Complaining About Discrimination and Harassment, These Events Are Insufficient as a Matter of Law to Show a Continuing Course of Conduct**

Plaintiff contends he may recover damages for every act of race harassment and retaliation for complaining about discrimination and harassment that he has suffered throughout his employment with the City. That is not the law. As we have said, ordinarily, a plaintiff cannot recover for acts occurring more than one year before the filing of the DFEH complaint, in this case, for acts occurring before April 16, 2001. (Gov. Code, § 12960, subd. (d); *Richards*, *supra*, 26 Cal.4th at pp. 811-812.) However, the continuing violation doctrine permits a plaintiff to recover for unlawful practices occurring outside the limitations period if the practices continued into that period. (*Dominguez v. Washington Mutual Bank* (2008) 168 Cal.App.4th 714, 720-721 (*Dominguez*).)

It is plaintiff's burden to plead and prove the timely filing of the DFEH complaint. (*Kim v. Konad USA Distribution, Inc.* (2014) 226 Cal.App.4th 1336, 1345-1346; see Chin et al., Cal. Practice Guide: Employment Litigation (The Rutter Group 2014) ¶ 16:253, p. 16-36 ["[P]laintiff bears the burden of pleading and proving timely filing of a sufficient complaint with the DFEH and obtaining a right-to-sue notice." (Italics omitted.)].) Therefore, when defendant has asserted the statute of limitation defense, plaintiff has the burden of proof to show his or her claims are timely under the continuing violation doctrine.

10

The continuing violation doctrine requires proof that the conduct occurring outside the limitations period was (1) similar or related to the conduct that occurred earlier; (2) the conduct was reasonably frequent; and (3) the conduct had not yet become permanent. (*Dominguez*, *supra*, 168 Cal.App.4th at pp. 720-721.) " '[P]ermanence' in the context of an ongoing process of accommodation of disability, or ongoing disability harassment, should properly be understood to mean the following: that an employer's statements and actions make clear to a reasonable employee that any further efforts at informal conciliation to obtain reasonable accommodation or end harassment will be futile. . . . [¶] [T]he statute of limitations begins to run . . . *either* when the course of conduct is brought to an end, as by the employer's cessation of such conduct or by the employee's resignation, *or* when the employee is on notice that further efforts to end the unlawful conduct will be in vain." (*Richards*, *supra*, 26 Cal.4th at p. 823.)

Viewing the record in the light most favorable to plaintiff and indulging in every legitimate inference which may be drawn from the evidence, there is substantial evidence to support the first two elements of the continuing violation doctrine. There was substantial evidence that plaintiff suffered harassment and retaliation in the 1990's, that at least some incidents were similar or related, and that the similar or related events were reasonably frequent at various times. However, there is no evidence in the record from which we may infer that the harassment and retaliation occurring in the 1990's had not become permanent by the time plaintiff served his 1999 suspension. To the contrary, the only reasonable inference is that by the time plaintiff served his 1999 suspension, he knew that further efforts to end the harassment and retaliation would be in vain.

Plaintiff experienced and spoke out against racism in the Department throughout the 1990's. Plaintiff protested racism in the Department in a 1991 letter to the City Council, in a 1994 interview with the City Personnel Department, in a 1994 City Council hearing, and in a 1997 deposition. In 1996, plaintiff filed a union grievance alleging racism in the weight room.

On September 24, 1998, plaintiff received an unsatisfactory interim evaluation. Plaintiff filed a grievance, which was denied. In September and October 1998, plaintiff

11

received six written reprimands for missing work or being tardy. He grieved each reprimand, and each grievance was denied.

Plaintiff was required to submit numerous reports explaining his absence from the Brush Task Force between May 18, 1998, and June 2, 1998. Plaintiff told his supervisors that, from his perspective, "it was clear a paper trail was being created for purposes of justifying some sort of discipline." He told his union representative that the frequent requests for reports of his activities were racial discrimination and retaliation.

On October 26, 1998, plaintiff was transferred to the HAU. He testified that he believed the transfer was "punitive and racially motivated." He grieved the transfer, but the grievance was denied.

On March 31, 1999, he was charged with 14 counts of misconduct for which disciplinary action was proposed. Five counts of misconduct were sustained, including failing to report for duty at the Brush Task Force, failing to maintain records of his inspection activities, failing to provide his supervisors with requested documents on two separate occasions, and insubordination for refusing to turn off the tape recorder. The Fire Chief approved a 10-day suspension. Plaintiff did not request a Board of Rights hearing to challenge the suspension, though he testified he "absolutely" believed the Department was discriminating against him and that, after he finished serving his suspension, he no longer had any hope "that somebody would listen to reason and not be tainted." He served the suspension in June 1999.

Plaintiff's own testimony establishes that he knew in 1998 the Department was engaged in discrimination and retaliation against him by creating a paper trail to justify some sort of discipline; that his 1998 transfer to the HAU was racially motivated and retaliatory; and that the 10-day suspension was racially motivated. He also testified that after he served the suspension, he no longer had any hope that the racism would end, and he knew future efforts to make changes would be futile.

Because the harassment and retaliation culminated in the 1999 suspension, and plaintiff knew future efforts to make changes would be futile, all of plaintiff's claims related to conduct that occurred before June 1999 are barred by the statute of limitations.

12

(*Richards*, *supra*, 26 Cal.4th at p. 823 [statute of limitations begins to run "*either* when the course of conduct is brought to an end . . . , *or* when the employee is on notice that further efforts to end the unlawful conduct will be in vain."]; *Cucuzza v. City of Santa Clara* (2002) 104 Cal.App.4th 1031, 1042-1043 [claim achieved permanence when City's only response to plaintiff's grievance was "to give her the opportunity to transfer out of the department"]; *Bass v. Joliet Public School District No. 86* (7th Cir. 2014) 746 F.3d 835, 839-840 [reassignment of duties and suspensions are discrete acts in contrast to a continuing violation, for which plaintiff must file a charge of discrimination within one year].)

**D.    There Is No Substantial Evidence to Support a Claim of Disparate Impact Race Discrimination Within the Limitations Period**

Plaintiff's theory of disparate impact race discrimination was that the Department's disciplinary policy had a disproportionately adverse impact on African-Americans.  Thus, plaintiff had to prove the Department's facially neutral discipline policy had a significant adverse impact on African-Americans.

Significantly, the jury returned its verdict in favor of the City, and against plaintiff, on his theory of disparate *treatment* race discrimination.  The jury found the City subjected plaintiff to an adverse employment action but that plaintiff's race was not a substantial motivating reason for the City's treatment of plaintiff.

" In ' "disparate treatment' " cases, the plaintiff alleges that an employer has treated *him or her* less favorably than others due to race, color, religion, sex or national origin, and the plaintiff must prove a discriminatory intent or motive. . . .  In ' "disparate impact" ' cases, by contrast, the plaintiff alleges and proves, usually through statistical disparities, that facially neutral employment practices adopted without a deliberately discriminatory motive nevertheless have such significant adverse effects on protected *groups* that they are 'in operation . . . functionally equivalent to intentional discrimination.' " (*Harris v. Civil Service Com.* (1998) 65 Cal.App.4th 1356, 1365, citations omitted.)

13

The City contends plaintiff was required to provide statistical evidence to prove the disciplinary policy had a disproportionate impact on African-Americans, and that plaintiff did not offer adequate statistical evidence to support this claim. It is well settled that valid statistical evidence is required to prove disparate impact discrimination, that is, that a facially neutral policy has caused a protected group to suffer adverse effects. " 'Once the employment practice at issue has been identified, causation must be proved; that is, the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group. . . . [S]tatistical disparities must be sufficiently substantial that they raise such an inference of causation.' " (*Carter v. CB Richards Ellis, Inc.* (2004) 122 Cal.App.4th 1313, 1323-1324, quoting *Watson v. Fort Worth Bank & Trust* (1988) 487 U.S. 977, 994-995.)[1]

We agree plaintiff did not offer substantial statistical evidence to support a prima facie case of disparate impact discrimination. Over the objections of the City, plaintiff offered memoranda describing affirmative action audits of the Department's disciplinary actions which were conducted by the City Personnel Department for the period January 1, 1990, through June 30, 1992. Plaintiff introduced these audits into evidence through the testimony of Jerry Thomas, a firefighter who had retired in 2007. Mr. Thomas testified as a percipient witness and offered no expert testimony concerning the audits. The City had moved in limine to exclude the audits and testimony about the audits on the grounds they were hearsay, inadmissible opinion and irrelevant. The court did not explain why it overruled these apparently valid objections when Mr. Thomas was asked about the audits.

The audit for the period of January 1 through June 30, 1990, includes this statement contained in a memorandum dated October 18, 1991, from the chief of the Human Resources and Benefits Division to the general manager of the Personnel Department: "While there appears to be a disproportionate amount of discipline against

---

[1]    "Because of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354.)

Blacks (30.8%), when they represent 10.5% of the workforce, the Department has indicated that each disciplinary case is reviewed on an individual case by case basis and that the Department has not noticed any trends or problem areas for a particular ethnic group." The audit for the period of July 1, 1990, through June 30, 1991, showed 32 percent of African-Americans received disciplinary actions, and 37.8 percent of African-American "sworn personnel" received disciplinary actions. The audit for the period of July 1, 1991, through June 30, 1992, showed 28 percent of African-Americans received disciplinary actions. A March 9, 1994 memorandum from the chief of the Human Resources and Benefits Division to the general manager of the City Personnel Department in reference to the audits for the period of July 1, 1990, to June 30, 1992, recommended the Department should continue to investigate the reasons for "the disproportionate amounts of discipline administered to Blacks."

The bare statistics cited in these memoranda, without more, are not substantial evidence the Department's disciplinary policy had a disproportionately adverse impact on African-Americans during the period January 1, 1990, through June 30, 1992. Even if they were, they are irrelevant to the period of 1998 and after, during which plaintiff's claims arose. The parties cite nothing in the record to suggest the audit results for January 1, 1990, through June 30, 1992, prove disparate impact race discrimination in the years 1998 and later. (See, e.g., *King v. General Electric Co.* (7th Cir. 1992) 960 F.2d 617, 626 ["[S]tatistical evidence cannot serve as a basis for proving discrimination beyond the time period analyzed."]; *EEOC v. Sears, Roebuck & Co.* (7th Cir. 1988) 839 F.2d 302, 329 [refusing to allow plaintiffs to use data from a two-year hiring period to show discrimination over a seven-year period].)

Plaintiff contends in his respondent's brief that "[t]he testimony supporting [plaintiff's] claim came from many witnesses, including, but not limited to, [plaintiff], McOsker, Thomas, and Hernandez." However, plaintiff provides no citations to the record in support of this argument. Parties are required to provide specific page citations to the record to support their factual recitations in their briefs. (Cal. Rules of Court, rule 8.204(a)(1)(C); *Duarte v. Chino Community Hospital* (1999) 72 Cal.App.4th 849,

15

856.) The court is not required to make an independent search of the record and may disregard any claims when no reference is furnished. (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246.) Certainly, we cannot undertake an independent search of this record, which includes 17 volumes of the reporter's transcript and five volumes of the clerk's transcript, including the motion to augment the record.

In any event, the argument appears to rest on evidence of racial discrimination *against plaintiff* which is irrelevant to a disparate impact claim. As discussed above, a disparate impact claim requires proof that a facially neutral policy has caused a protected *group* to suffer adverse effects. The jury rejected plaintiff's claim the City engaged in racial discrimination against *him*. Evidence of racial discrimination against plaintiff cannot save his disparate impact claim.

**E.      There Is No Substantial Evidence to Support a Claim of Racial Harassment Within the Limitations Period**

"[H]arassment consists of a type of conduct not necessary for performance of a supervisory job. Instead, harassment consists of conduct outside the scope of necessary job performance, conduct presumably engaged in for personal gratification, because of meanness or bigotry, or for other personal motives. Harassment is not conduct of a type necessary for management of the employer's business or performance of the supervisory employee's job." (*Reno v. Baird* (1998) 18 Cal.4th 640, 645-646.)

The City contends the only incidents of harassment took place before April 16, 2001, outside the limitations period. The City recites evidence of racial comments made in 1980's and the hostile work environment while plaintiff served as an Inspector in the 1990's in the CIU, the 1998 Brush Task Force, and the HAU. The City tells us "However, Plaintiff presented no evidence that any acts of 'harassment' under FEHA occurred during the one-year period preceding his filing of his DFEH complaint on April 16, 2002."

In response, plaintiff refers to evidence of racially offensive comments made "in the early part of his career" and tells us the harassing conduct continued into 2001, but he does not tell us when any of the events to which he refers occurred, nor does he provide

16

any citations to the record to enable us to find out for ourselves. "Issues do not have a life of their own: if they are not raised or supported by argument or citation to authority, we consider the issues waived. [Citations.]" (*Jones v. Superior Court* (1994) 26 Cal.App.4th 92, 99.) Plaintiff's burden of proof to show his claims are timely includes the requirement to provide citations to the record of evidence of harassment occurring on or after April 16, 2001.

It appears that almost all the events that plaintiff describes as harassment took place before 2000. The only evidence to which plaintiff refers within the limitations period is one reference to "the unwarranted discipline." As we have seen, plaintiff served a 10-day suspension in 1999, which is outside the limitations period. On February 15, 2001, the Department imposed a 15-day suspension which plaintiff served April 16 through April 30, 2001.

A disciplinary suspension does not constitute harassment under FEHA as a matter of law. (*Janken v. GM Hughes Electronics* (1996) 46 Cal.App.4th 55, 63-65, quoted extensively with approval in *Reno v. Baird*, *supra*, 18 Cal.4th at pp. 645-650.) *Janken* explained that "commonly necessary personnel management actions such as hiring and firing, job or project assignments, office or work station assignments, promotion or demotion, performance evaluations, the provision of support, the assignment or nonassignment of supervisory functions, deciding who will and who will not attend meetings, deciding who will be laid off, and the like, do not come within the meaning of harassment. These are actions of a type necessary to carry out the duties of business and personnel management. These actions may retrospectively be found discriminatory if based on improper motives, but in that event the remedies provided by the FEHA are those for discrimination, not harassment. Harassment, by contrast, consists of actions outside the scope of job duties which are not of a type necessary to business and personnel management. This significant distinction underlies the differential treatment of harassment and discrimination in the FEHA." (*Janken*, at pp. 64-65.)

In sum, there is no substantial evidence of harassment within the one-year limitations period.

17

**F.     There Is No Substantial Evidence to Support a Claim of Retaliation for Plaintiff's Complaints About Race Discrimination or Harassment Within the Limitations Period**

The City contends the only adverse employment action taken against plaintiff on or after April 16, 2001, was the 15-day suspension that plaintiff served from April 16 through April 30, 2001, and that there is no evidence from which the jury could reasonably find that suspension was racially motivated.

"[I]n order to establish a prima facie case of retaliation under the FEHA, a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action. . . .  Once an employee establishes a prima facie case, the employer is required to offer a legitimate, nonretaliatory reason for the adverse employment action. . . .  If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation ' " 'drops out of the picture,' " 'and the burden shifts back to the employee to prove intentional retaliation." (*Yanowitz*, *supra*, 36 Cal.4th at p. 1042, citations omitted.)

Assuming without finding, for purposes of brevity only, that plaintiff produced substantial evidence of events within the limitations period to establish a prima facie case that his 2001 suspension was retaliatory, we nonetheless find there is no substantial evidence that undermines the City's proof it had a legitimate, nonretaliatory reason for the 2001 suspension.  The suspension was based on plaintiff's insubordination and failure to take home a Department on-call emergency vehicle assigned to him in March 2000. The vehicle was equipped with a special radio to enable the Inspector to communicate with DWP personnel about water delivery while en route to the scene.  Instead of home garaging the on-call vehicle, plaintiff left it in the City Hall East parking structure, in an unauthorized area, because of his obligations to attend a series of community meetings during "off-duty" hours.  The City contended that, by not having the vehicle at his residence, plaintiff compromised his ability to respond as quickly as possible to an emergency.

18

The City tells us that plaintiff offered no evidence that the suspension was unjustified or that the stated reasons for the action were a pretext for retaliation. "The plaintiff's burden is to prove, by competent evidence, that the employer's proffered justification is mere pretext; i.e., that the presumptively valid reason for the employer's action was in fact a coverup. . . . In responding to the employer's showing of a legitimate reason for the complained-of action, the plaintiff cannot ' "simply show the employer's decision was wrong, mistaken, or unwise. Rather, the employee ' "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence,' and hence . . . infer 'that the employer did not act for the [asserted] non-discriminatory reasons.' " ' " '" (*McRae v. Department of Corrections & Rehabilitation* (2006) 142 Cal.App.4th 377, 388-389, citations omitted (*McRae*).)

In his reply brief, plaintiff says nothing whatever in response to the City's argument that he failed to show the 2001 suspension was unjustified or pretextual. Plaintiff's only argument is a summary, again without any record citations, of his protected activities in the 1980's, 1990's and the two complaints made sometime in 1999 or 2000 alleging that Assistant Fire Marshal Fulmis made two "inappropriate" and "culturally insensitive" comments in plaintiff's presence. Plaintiff also makes a fleeting reference to "unwarranted discipline . . . that lasted through 2001" but, again, he nowhere articulates any reason why the Department's stated reasons for the April 2001 suspension were unjustified or pretextual, i.e., "unworthy of credence" as explained in *McRae*, *supra*. The City's explanation of the reasons for the suspension are not facially implausible. Again, issues that are not supported by argument or citation to authority are considered waived. (*Jones v. Superior Court*, *supra*, 26 Cal.App.4th at p. 99.)

**G.** **The Claim of Failure to Prevent Race Discrimination, Retaliation and Harassment Also Fails**

The City says nothing whatever about the jury's verdict in favor of plaintiff on his cause of action for failure to prevent discrimination, retaliation or harassment. On the

19

other hand, plaintiff does nothing more than rehash his recitation of events in the 1980's and 1990's without any record citations. It would serve no purpose for us to find the City waived its right to appeal the verdict on this cause of action, because a predicate for the verdict is substantial evidence of discrimination, retaliation and harassment. (*Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 289 [no liability for failure to prevent conduct in violation of FEHA "except where the actions took place and were not prevented"].) As we have seen, most of plaintiff's claims are barred by the statute of limitations, and the evidence of events within the limitations period was insufficient to establish a prima facie case of discrimination, harassment or retaliation.

Since we find the court should have granted the motion for judgment notwithstanding the verdict for failure of proof of liability, we need not address the adequacy of the evidence to support the damages award.

## DISPOSITION

The judgment is reversed and remanded for entry of judgment in favor of Appellant. Appellant City of Los Angeles is to recover its costs of appeal.

GRIMES, J.

WE CONCUR:

FLIER, Acting P. J.

OHTA, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.