Filed 9/20/22  Rodriguez v. County of Los Angeles CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| ANDREW RODRIGUEZ, | B304818; B307010 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC680213) |
| v. | |
| COUNTY OF LOS ANGELES, | |
| Defendant and Appellant. | |

APPEALS from a judgment and postjudgment order of the Superior Court of Los Angeles County, Susan Bryant-Deason, Judge.  Reversed and remanded.

Miller Barondess, Mira Hashmall, Emily A. Rodriguez-Sanchirico, and Margret L. Flodeen, for Defendant and Appellant.

Craig T. Byrnes and Alan J. Romero, for Plaintiff and Respondent.

# I.  INTRODUCTION

A jury returned a verdict in favor of plaintiff Andrew Rodriguez, a deputy with the Los Angeles County Sheriff's Department (the Sheriff's Department) and against defendant the County of Los Angeles (the County), on plaintiff's claims for hostile work environment harassment and retaliation in violation of the Fair Employment and Housing Act (FEHA; Gov. Code, § 12900 et seq.).[1]  The trial court subsequently granted plaintiff's motion for an award of attorney fees.

On appeal, the County argues:  there was insufficient evidence to support the verdicts; the jury instructions and special verdict form were erroneous and prejudiced the County; the $8.1 million damages award was not supported by the evidence and excessive; and the attorney fees award must be reversed if the judgment is reversed.

We conclude that although there was substantial evidence to support the verdicts, the judgment and attorney fees order must be reversed in light of the trial court's delivery of erroneous and prejudicial jury instructions.  We will therefore remand this cause for a new trial.

---

[1]  Further statutory references are to the Government Code unless otherwise indicated.

## II.  BACKGROUND[2]

A.  *Plaintiff's Employment*

### 1.  Patrol Training

On December 1, 2013, plaintiff, who had been employed by the Sheriff's Department since 2007, began a field patrol training program at the City of Industry Sheriff's station (Industry station).  Prior to entering patrol training, plaintiff had been assigned to the Inmate Reception Center and courthouses.

Joanne Arcos was plaintiff's first training officer.  Based on his training as a deputy, plaintiff formed the opinion that Arcos was initiating stops without reasonable suspicion.  He also believed that she had engaged in the unlawful seizure of evidence.

On one occasion, plaintiff observed Arcos unlawfully seize drug paraphernalia from a suspect.  When Arcos and plaintiff returned to the police station to prepare the arrest report, Arcos dictated to plaintiff what he should write.  When plaintiff contradicted Arcos's recitation, Arcos became upset and raised her voice.  Arcos then told plaintiff that she would take over writing the report and would not include plaintiff's name in it.

---

[2]  "In summarizing the facts, we view the evidence in favor of the judgment." (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 693–694 (*Roby*); *King v. U.S. Bank National Association* (2020) 53 Cal.App.5th 675, 681.)

3

Plaintiff told Arcos on numerous occasions that he was concerned about her conduct. He also advised his superiors about Arcos's unlawful conduct.

Plaintiff was next assigned to field training officer Tim Nakamura. Plaintiff and Nakamura worked the night shift and Nakamura advised plaintiff that anyone out on the street after dark was "'up for grabs,'" meaning they could be detained unlawfully. Plaintiff observed Nakamura engage in numerous unlawful detentions: Nakamura stopped and searched a vehicle with four male Hispanic occupants; he detained a black woman in order to bring his arrest numbers up; and he detained three Hispanic men who were filling up their car at a gas station. Plaintiff complained to Nakamura over 20 times about his conduct. He also voiced his concerns to other deputies, who told him that Nakamura, a friend of Arcos, did not like plaintiff because of his complaints.

Plaintiff was next assigned to field training officer George Meza. Plaintiff had a generally good relationship with Meza. But, in July 2014, while Meza was on vacation, plaintiff was assigned to patrol with Deputy Lund. On one occasion, plaintiff left Lund at a restaurant, where Lund ate with other deputies, while plaintiff went next door to get food for himself. When Meza returned from vacation, he was angry that plaintiff had obtained something to eat while he was on his shift and because plaintiff had purportedly failed to complete reports. Meza told plaintiff that he wanted to "'punch [plaintiff] in the fucking face right now.'" Plaintiff and Meza separately reported the incident to the watch commander, who told plaintiff to write a memo documenting Meza's threat. Plaintiff was then transferred to work at Industry station's jail.

4

On August 26, 2014, plaintiff had a meeting with Captain Tim Murakami and Lieutenant John Gannon. Murakami told plaintiff that if he did not either quit or voluntarily leave patrol and return to custody duties, Murakami would open an internal affairs investigation against him. Plaintiff did neither.

On September 4, 2014, Murakami sent a letter to the captain of personnel management, asking whether plaintiff could be compelled to undergo a psychological evaluation to determine his fitness for duty. Murakami was concerned about plaintiff's "pattern of behavior indicating an integrity issue and/or underlying medical/mental health problem."

### 2. Medical Leave

In October 2014, plaintiff went on medical leave due to his inability to sleep, migraines, and gastrointestinal issues. Dr. Ynolde Smith, plaintiff's treating physician, diagnosed plaintiff with high blood pressure, which was likely due to job stress, and referred plaintiff to a gastroenterologist. The gastroenterologist determined that plaintiff should undergo surgery, which took place in December 2014. Plaintiff returned to work at the jail for one or two days in December 2014 before he took another medical leave. Plaintiff did not return to work at the Sheriff's Department.

While on medical leave, plaintiff received a letter advising him of his duties while on leave. The letter informed plaintiff that he was on "schedule A," which required him to remain at his place of residence from 9 a.m. to 5 p.m., Monday through Friday. Plaintiff was also required to obtain permission to leave his location for appointments. The letter advised plaintiff that the

5

Sheriff's Department would make regular contact with him to "determine [his] welfare and anticipated recovery period and to ensure [the Sheriff's Department had his] current contact information." Finally, it directed plaintiff to complete and submit a personnel information form.

### 3. Internal Affairs Investigations

During plaintiff's medical leave, the Sheriff's Department opened three internal affairs investigations of him.

#### a. Absence from work without doctor's note

The first investigation was related to plaintiff's absence from work. Michael Mileski, the return-to-work sergeant, was responsible for overseeing trainee deputies that were out for injuries. On December 1, 2014, Dr. Smith prepared a note indicating that plaintiff was able to return to work on December 2, 2014. When Sergeant Mileski asked plaintiff whether he would be returning to work on December 2, 2014, plaintiff requested and received permission to take additional days off. With the additional days off, plaintiff was scheduled to return to work on December 8, 2014.

On December 8, 2014, Mileski called plaintiff and asked whether he would be returning to work that day. Plaintiff responded that he would not because he needed to prepare for a scheduled surgery. On December 9, 2014, Mileski wrote a supervisory inquiry alleging that plaintiff had disobeyed an order to return to work. Mileski and plaintiff disputed whether Mileski

had ordered plaintiff to return to work. The inquiry resulted in a disciplinary action against plaintiff.

b. Outside employment

The second investigation involved plaintiff's outside employment at Disneyland. As we describe below, during the investigation, deputies sought to determine the nature of plaintiff's medical condition and his whereabouts.

Plaintiff had been employed full time at Disneyland from 2000 to 2007, when he began work at the Sheriff's Department. Beginning in 2007, plaintiff continued to work at Disneyland as a seasonal employee.

On June 9, 2015, Sergeant Greg Taylor, the return-to-work sergeant at Industry station, sent Dr. Smith a letter asking what positions were suitable for plaintiff once he returned to work. Taylor subsequently visited Dr. Smith's office and spoke to a nurse about plaintiff's restrictions. The office faxed a response letter in July 2015, describing the duties plaintiff could perform. Dr. Smith told plaintiff that she was extremely uncomfortable with the questions Taylor asked the members of her office. Plaintiff became too embarrassed to continue seeing Dr. Smith.

On July 14, 2015, Taylor tried to contact plaintiff in person at his residence and by phone to see if he could return to work in August 2015. When plaintiff did not respond, Taylor went to Disneyland and learned that plaintiff worked there. Following further investigation, Taylor concluded that plaintiff had failed to fill out a form indicating that he had outside employment.

On August 13, 2015, Lieutenant Gannon went to plaintiff's residence and rang the doorbell. Plaintiff did not respond and

Gannon left his business card. Taylor then prepared a supervisory inquiry into plaintiff's unauthorized outside employment. Captain Murakami authorized an internal affairs investigation.

Sergeant Ronald Ridley was part of the Sheriff's Department's Internal Affairs Bureau and, on April 13, 2016, he was assigned to investigate plaintiff's outside employment at Disneyland. On June 7, 2016, Ridley and his partner Lieutenant John Adams went to Disneyland and met with the security supervisor. The supervisor confirmed that plaintiff had resumed his employment with Disneyland on February 22, 2015. Ridley and Adams were able to gain access to plaintiff's personnel files and speak with his manager. They told plaintiff's Disneyland manager that plaintiff was in serious trouble at the Sheriff's Department. Ridley and Adams then went to plaintiff's residence and told a neighbor that plaintiff was in trouble. Plaintiff noticed two undercover patrol units on his street, writing down makes and models of cars parked in front of his home.

On June 28, 2016, Ridley and Adams went to Dr. Smith's medical office. Ridley wanted to determine whether Dr. Smith had placed any work restrictions for plaintiff and whether plaintiff had scheduled any upcoming appointments. The medical office, citing patient confidentiality, refused to provide any of the information requested by Ridley. Dr. Smith described the visit as disruptive. Following the investigation, the Sheriff's Department placed plaintiff on suspension.

Plaintiff was subsequently fired by Disneyland. Plaintiff believed his firing was related to the Sheriff's Department's investigation.

### c. Taking police action while relieved of duty

The third Internal Affairs investigation involved plaintiff's taking of police action while relieved of duty. On September 4, 2015, Lieutenant Gannon relieved plaintiff of duty. On November 18, 2015, an individual appeared to be "huffing" gas from an air conditioning unit in front of plaintiff's home. Plaintiff detained the suspect, called the police, and reported the incident. Plaintiff did not declare himself to be a law enforcement officer when he detained the suspect. He did, however, tell the responding officers that he was a Sheriff's deputy. The police officers directed plaintiff to list Industry station as his contact address for a subpoena.

In February 2016, Taylor received a subpoena from the Anaheim Police Department for plaintiff to testify about the incident. Taylor concluded that plaintiff had violated Sheriff's Department policy by failing to notify his unit commander of an off-duty incident in which he took police action to detain a person. Taylor then submitted a supervisory inquiry for this matter to Captain Murakami on March 9, 2016.

## B.  *Argument, Jury Instructions, and Verdict*

Plaintiff proceeded to trial on his two FEHA claims. During opening statements, plaintiff's counsel explained that plaintiff had protested other deputies' illegal conduct and race-based policing, which resulted in the Sheriff's Department retaliating against him with internal affairs investigations. According to counsel, the harassment claim was based on the County's harassment of plaintiff for "having taken medical leave,

his filing of a workers' compensation claim; having protested the conditions of employment; having protested illegal orders[,] for example, to falsify reports; and finally, protesting illegal acts of the [County], such as falsification of official reports."

Following the presentation of evidence, the trial court instructed the jury on the elements of plaintiff's claims. On plaintiff's harassment claim, the court instructed:

"[Plaintiff] claims that he was subjected to harassment based on his disability and medical conditions at [the Sheriff's Department], causing a hostile or abusive work environment. To establish this claim, [plaintiff] must prove all of the following:

"1. That [plaintiff] was an employee of [the Sheriff's Department];

"2. That [plaintiff] was subjected to unwanted harassing conduct because he had a medical condition, protested conditions of employment, protested illegal orders, and/or protested illegal acts, such as the falsification of official government reports;

"3. That the harassing conduct was severe or pervasive;

"4. That a reasonable person in [plaintiff]'s circumstances would have considered the work environment to be hostile or abusive;

"5. That [plaintiff] considered the work environment to be hostile or abusive;

"6. That a supervisor engaged in the conduct or that [the Sheriff's Department], or its supervisors or agents, knew or should have known of the conduct and failed to take immediate and appropriate corrective action;

"7. That [plaintiff] was harmed; and

"8. That the conduct was a substantial factor in causing [plaintiff]'s harm."

10

On plaintiff's retaliation claim, the court instructed:

"[Plaintiff] claims that [the Sheriff's Department] retaliated against him for taking medical leave, protesting the conditions of employment, protesting illegal orders, and/or protesting the illegal acts of [the Sheriff's Department], such as the falsification of official government reports. To establish this claim, [plaintiff] must prove all of the following:

"1. That [plaintiff] took medical leave, protested conditions of employment, protested illegal orders, and/or protested the illegal acts of [the Sheriff's Department], such as the falsification of official government reports;

"2. That [the Sheriff's Department] subjected [plaintiff] to an adverse employment action;

"3. That [plaintiff]'s taking medical leave, protesting the conditions of employment, protesting illegal orders, and/or protesting the illegal acts of [the Sheriff's Department], such as the falsification of official government reports was a substantial motivating reason for [the Sheriff's Department's] decision to subject [plaintiff] to an adverse employment action;

"4. That [plaintiff] was harmed; and

"5. That [the Sheriff's Department]'s decision to subject [plaintiff] to an adverse employment action was a substantial factor in causing him harm."

In delivering his closing argument, plaintiff's counsel focused on the Sheriff's Department's cover-up of purported misdeeds by officers: "I told you right off the bat this is a case about police corruption. It is a case about forged documents. It is a case about lying under oath." Counsel also argued that the reason the Sheriff's Department retaliated against plaintiff was that: "He spoke out against the Sheriff's Department, and, as a

11

result, they decide[d] to destroy his life." Counsel continued, "And, you know, this is a once in a generation type case, the type of corruption that we believe we've exposed as part of this case, and I would ask for appropriate damages."

On October 4, 2019, the jury returned a unanimous verdict in favor of plaintiff and awarded him $8.1 million in damages.

On December 13, 2019, the trial court entered judgment in plaintiff's favor. On March 6, 2020, the County timely filed a notice of appeal.

## C.     *Attorney Fees Motions*

On March 27, 2020, plaintiff moved for an award of attorney fees. On July 17, 2020, the trial court granted, in part, plaintiff's motion and awarded him $214,791.88. The County timely appealed the order. The two appeals were consolidated.

## III.  DISCUSSION

### A.     *Sufficiency of the Evidence*

The County argues there is insufficient evidence to support the jury's verdict in favor of plaintiff and requests that we reverse and enter a judgment in its favor.

#### 1.      Standard of Review

In assessing the sufficiency of the evidence supporting the jury's findings of fact, we apply a substantial evidence standard of review. (*Cleveland v. Taft Union High School Dist.* (2022) 76

Cal.App.5th 776, 802.) Our task is to decide "'whether, on the entire record, there is *any* substantial evidence, contradicted or uncontradicted,' supporting the court's finding. [Citation.] 'We must accept as true all evidence . . . tending to establish the correctness of the . . . findings . . ., resolving every conflict in favor of the judgment.'" (*Sabbah v. Sabbah* (2007) 151 Cal.App.4th 818, 822–823.) If substantial evidence exists, ""'it is of no consequence that the [appellate] court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion.""" (*In re Marriage of DeSouza* (2020) 54 Cal.App.5th 25, 33.)

### 2. Harassment

FEHA makes it an unlawful employment practice "[f]or an employer . . . because of race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, or veteran or military status, to harass an employee . . . ." (§ 12940, subd. (j)(1).) In order to prevail on a claim of harassment under FEHA, a plaintiff must establish: (1) he was a member of a class protected by FEHA; (2) he was subjected to severe and pervasive harassment; (3) the harassment was based on his protected status; and (4) the harassment unreasonably interfered with plaintiff's work performance; and (5) plaintiff suffered resulting harm. (*Galvan v. Dameron Hospital Assn.* (2019) 37 Cal.App.5th 549, 563; see *Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 462.)

13

### a. Protected Status

Contrary to the trial court's jury instructions, as relevant here, FEHA only prohibits harassment based on physical disability and medical condition. A "disability" is a physical or mental condition that "[l]imits a major life activity." (§ 12926, subd. (m).) We conclude there was sufficient evidence that plaintiff suffered from migraines, hypertension, and gastrointestinal issues, which prevented him from working at the Sheriff's Department. And, contrary to the County's contention, plaintiff's ability to work at Disneyland did not defeat plaintiff's harassment claim as a matter of law. "'[W]orking' is a major life activity, regardless of whether the actual or perceived working limitation implicates a particular employment or a class or broad range of employments." (§ 12926.1, subd. (c); Cal. Code Regs., tit. 2, § 11065, subd. (l)(3)(D).)

### b. Severe or pervasive harassment

"The words 'severe' and 'pervasive' have no peculiar meanings under the law. The adjective 'severe' is defined as 'strongly critical and condemnatory' or 'inflicting pain or distress.' [Citation.] The verb 'pervade' is defined as 'to become diffused throughout every part of.'" (*Caldera v. Department of Corrections and Rehabilitation* (2018) 25 Cal.App.5th 31, 38.)

The County contends that the Sheriff's Department's investigations and suspensions cannot constitute harassment as a matter of law. Even assuming that making "commonly necessary personnel management actions" does not come within the meaning of harassment (*Reno v. Baird* (1998) 18 Cal.4th 640,

14

646–647), the evidence here demonstrated that the Sheriff's Department not only investigated and suspended plaintiff, but its deputies also visited plaintiff's home, told his neighbors that he was in trouble, had undercover patrol cars stationed outside his home, told a Disneyland manager that plaintiff was in trouble, and visited plaintiff's doctor's office in order to access his medical records. The jury could reasonably conclude that these acts were not necessary to personnel management and instead constituted severe and pervasive harassment.

### c. Nexus

Finally, the County argues there was no nexus between the harassing conduct and plaintiff's protected status as suffering from a physical disability. (See *Roby*, *supra*, 47 Cal.4th at p. 710.) Whether such a nexus exists is a question of fact for the jury. (*Ibid.*) As we will discuss further below, the evidence at trial demonstrated that the deputies' harassing conduct was largely motivated by their reaction to plaintiffs' complaints about unlawful conduct. Nonetheless, we cannot conclude there was *no* substantial evidence of a nexus between the harassment and plaintiff's physical disability. In September 2014, Murakami expressed concern about plaintiff's "underlying medical/mental health problems." And, all the harassing conduct described above occurred after plaintiff went on medical leave. Finally, part of the deputies' conduct was directed at asking Dr. Smith about the nature of plaintiff's disability during a disruptive visit. On this record, we conclude there was sufficient evidence for the jury to find the County liable for FEHA harassment in violation of section 12940, subdivision (j)(1).

### 3. Retaliation

FEHA makes it an unlawful employment practice "[f]or any employer . . . to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part." (§ 12940, subd. (h).) In order to demonstrate retaliation in violation of FEHA, "'a plaintiff must show (1) he or she engaged in a "protected activity," (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action. . . .'" (*Jumaane v. City of Los Angeles* (2015) 241 Cal.App.4th 1390, 1408.)

#### a. "Protected activity"

On appeal, the County contends that taking medical leave is not a protected activity under FEHA. While taking medical leave may not be an activity protected under section 12940, subdivision (h), retaliation for taking medical leave constitutes a violation of section 12945.2, subdivision (k) of the California Family Rights Act (CFRA). Further, CFRA is a part of FEHA (*Neisendorf v. Levi Strauss & Co.* (2006) 143 Cal.App.4th 509, 516) and is enforced by the Department of Fair Employment and Housing in the same manner as a FEHA claim.[3] (See § 12960.)

---

[3] The County also argues that plaintiff failed to properly proceed on a violation of CFRA. The record, however, demonstrates that the County acquiesced to permitting plaintiff

16

The elements of retaliation for taking medical leave are: "(1) the defendant was an employer covered by CFRA; (2) the plaintiff was an employee eligible to take CFRA leave; (3) the plaintiff exercised [his] right to take leave for a qualifying CFRA purpose; and (4) the plaintiff suffered an adverse employment action, such as termination, fine, or suspension, because of [his] exercise of [his] right to CFRA leave." (*Dudley v. Department of Transportation* (2001) 90 Cal.App.4th 255, 261, fn. omitted (*Dudley*).) The County does not dispute on appeal that: it is an employer covered by the CFRA; plaintiff was an employee eligible to take medical leave; and plaintiff took medical leave for a qualifying purpose. Thus, substantial evidence supports a finding that plaintiff engaged in "protected activity" by taking medical leave.

### b. Adverse action

The County next argues there was insufficient evidence that it took any adverse action against plaintiff. "[A]dverse employment action may take the form of discharge from employment, fine, suspension, expulsion, or other adverse discriminatory actions." (*Dudley*, *supra*, 90 Cal.App.4th at p. 264.) Here, substantial evidence supports a finding that after plaintiff went on medical leave, the Sheriff's Department took

_____

to proceed on a claim of retaliation for taking medical leave. (See also *Duchrow v. Forrest* (2013) 215 Cal.App.4th 1359, 1377–1378 [motion to amend pleadings to conform to proof permitted during trial so long as opposing party is not prejudiced].)

17

adverse action against him by initiating the three administrative investigations and suspending him.

### c. Substantial motivating factor

Finally, the County contends that there was no causal link between the adverse action and plaintiff's taking of medical leave. In order for plaintiff to demonstrate a causal link, plaintiff's taking of medical leave must have been a substantial motivating factor for the retaliation. (See *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 232; CACI No. 2620.) We conclude there was substantial, albeit thin, evidence of such a link.

"'When an adverse employment action "follows hard on the heels of protected activity, the timing often is strongly suggestive of retaliation."'" (*Bareno v. San Diego Community College Dist.* (2017) 7 Cal.App.5th 546, 571.) Here, plaintiff took medical leave in October 2014. Two months later, Sergeant Mileski initiated a supervisory inquiry into plaintiff, which led to an administrative investigation being opened and found true. Moreover, as discussed above, deputies from the Sheriff's Department went to Dr. Smith's office on two occasions to inquire about plaintiff's medical condition. On this record, a jury could reasonably find that plaintiff's taking of medical leave was a substantial motivating factor for the adverse actions against him. Accordingly, we find there was sufficient evidence to support the verdict on the retaliation claim.

B.     *Jury Instructions*

The County alternatively argues that we should remand for a new trial because the jury instructions for FEHA harassment and retaliation were erroneous and prejudicial.  As a preliminary matter, plaintiff argues that the County waived any error by failing to object.  We disagree.  "When a trial court gives a jury instruction which is correct as far as it goes but which [appellant argues] is too general or is incomplete for the state of the evidence, a failure to request an additional or a qualifying instruction will waive a party's right to later complain on appeal about the instruction which was given." (*Suman v. BMW of North America, Inc.* (1994) 23 Cal.App.4th 1, 9.)  But, "[a] party may . . . challenge on appeal an erroneous instruction without objecting at trial." (*Lund v. San Joaquin Valley Railroad* (2003) 31 Cal.4th 1, 7.)

Here, the County does not complain that the instructions were either too general or incomplete.  Rather, it contends that the instructions were erroneous in that they allowed the jury to find harassment and retaliation based on activity that was not protected by FEHA.  Thus, even absent an objection, we will consider the merits of the County's argument.[4]

---

[4]     Because the challenged jury instructions were jointly prepared by the parties, we consider whether, under the doctrine of invited error, the County has waived its argument on appeal. (*Regalado v. Callaghan* (2016) 3 Cal.App.5th 582, 592.)  The doctrine does not apply "when a party, while making the appropriate objections, acquiesces in a judicial determination. [Citation.]  As this court has explained: "'An attorney who submits to the authority of an erroneous, adverse ruling after

1. <u>Protected Activity</u>

"'Challenges to jury instructions are subject to a de novo standard of review.'" (*Collins v. County of San Diego* (2021) 60 Cal.App.5th 1035, 1055.) The trial court instructed the jury that it could find in favor of plaintiff on his harassment claim if it concluded that plaintiff "was subjected to unwanted harassing conduct because he had a medical condition, protested conditions of employment, protested illegal order, and/or protested illegal acts, such as falsification of government reports." The only relevant protected statuses for a FEHA harassment claim, however, were physical disability and medical condition. (§ 12940, subd. (j)(1).) The court also instructed the jury that it could return a verdict in favor of plaintiff on his retaliation claim if it found that the Sheriff's Department retaliated against him "for taking medical leave, protesting the conditions of

---

making appropriate objections or motions, does not waive the error in the ruling by proceeding in accordance therewith and endeavoring to make the best of a bad situation for which he was not responsible.'" [Citations.]" (*Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 212–213; *American Master Lease LLC v. Idanta Partners, Ltd.* (2014) 225 Cal.App.4th 1451, 1472–1473.) Our review of the record indicates that the County filed a motion for nonsuit on the grounds that plaintiff could not prevail on his FEHA harassment and retaliation claims because he could not establish that he belonged to a protected class. In discussing its nonsuit motion, the County's counsel argued that if the court were to grant the motion, she would modify the jury instructions to state, "That [plaintiff] took medical leave, period. That . . . retaliated against him for taking medical leave, period." On this record, we decline to apply the doctrine of invited error.

employment, protesting illegal orders, and/or protesting the illegal acts of [the Sheriff's Department], such as the falsification of official government reports." The protesting of illegal orders, protesting of illegal acts, and the falsification of government reports are not protected by FEHA. "That [plaintiff] opposed what he viewed as unwise or even improper actions by the Department is not enough to make his opposition a protected activity." (*Dinslage v. City and County of San Francisco* (2016) 5 Cal.App.5th 368, 382.) Moreover, "discrimination by an employer against members of the general public is not a prohibited *employment* practice under the FEHA." (*Id.* at p. 383.) Accordingly, the court's instructions were erroneous. (*Nejadian v. County of Los Angeles* (2019) 40 Cal.App.5th 703, 723.)

### 2. Prejudice

"'If an instruction is found to be erroneous, reversal is required only when "it appears probable that the improper instruction misled the jury and affected [its] verdict. [Citation.]" [Citation.]' [Citation.] In determining whether a jury was likely misled, the court must also evaluate "'(1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." [Citation.]'" (*Spriesterbach v. Holland* (2013) 215 Cal.App.4th 255, 263.) The County has demonstrated it was prejudiced by the error.

The focus of plaintiff's presentation at trial was that he was harassed and retaliated against for complaining about his training officers' illegal conduct. It was what counsel discussed in opening statement, it comprised the majority of the evidence

presented at trial, and it was the theme of counsel's closing argument. On this record, we have little trouble finding that the instructions misled the jury and affected its verdict. Accordingly, we will reverse for a new trial.[5]

C. *Attorney Fees Award*

Because we vacate the judgment, we also vacate the attorney fees award. (*Gunther v. Alaska Airlines, Inc.* (2021) 72 Cal.App.5th 334, 358.)

---

[5] Because we find the instructions were erroneous and prejudicial, we need not discuss the parties' arguments regarding the special verdict form and damages.

22

## IV.  DISPOSITION

The judgment and order awarding attorney fees are reversed.  The matter is remanded with directions for the trial court to hold a new trial.  Defendant the County of Los Angeles is entitled to costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

KIM, J.

We concur:

RUBIN, P. J.

MOOR, J.

23