Filed 8/29/25  Ulloa v. SASCO CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| ANTONIO ULLOA, | B331169 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 20STCV14710) |
| v. | |
| SASCO, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert B. Broadbelt, Judge.  Affirmed.

Employee Justice Legal Group, Kaveh S. Elihu, and Matias N. Castro for Plaintiff and Appellant.

Jackson Lewis and Dylan B. Carp for Defendant and Respondent.

———————————

Plaintiff Antonio Ulloa appeals from a judgment entered after the trial court granted summary adjudication for his former employer, defendant SASCO, on a variety of discrimination, retaliation, and wage-and-hour claims.  On appeal, Ulloa does not challenge the trial court's order with regard to Ulloa's wage-and-hour claims (eleventh through fifteenth causes of action), but he contends there were triable issues of material fact with regard to causes of action alleging age and disability discrimination, retaliation, failure to accommodate, failure to engage in the interactive process, and wrongful termination (first through tenth causes of action).  We conclude that Ulloa has not demonstrated triable issues as to any cause of action, and thus we affirm the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

## I.      Background.

### A.      SASCO.

SASCO is an electrical contractor based in Fullerton, California.  SASCO's construction-related work is divided into office and field work.  On the office side, SASCO is organized by groups, each of which is headed by a project manager and project engineer who determine staffing needs.  On the field side, each job is managed by a foreman, who reports to a general foreman. The general foreman reports to a superintendent, who reports to the director of field operations.  As relevant to the present litigation, Mark Smith was the project manager, April Benson was the project engineer, Jack Ivy was the superintendent, and Smokey Stanton was the director of field operations.

SASCO hired electricians through the local electrician's union, the International Brotherhood of Electrical Workers,

2

Local 11 (electrician's union). The electrician's union maintained a "book"—i.e., a list of union members seeking work—and sent union members out to jobs based on the length of time they had been out of work. If SASCO had more electricians than it needed, it would terminate them and send them back to the union to sign up for new work.

### B.  Ulloa's employment by SASCO.

Plaintiff Ulloa is a journeyman transportation system electrician (journeyman electrician) and a member of the electrician's union.  SASCO hired Ulloa through his union in August 2013, when Ulloa was 51 years old.  The terms of Ulloa's employment were controlled by the Electrician Union's Collective Bargaining Agreement in effect from July 1, 2014 to June 30, 2019 (CBA).  As a journeyman electrician, Ulloa was qualified to work on outside wiring jobs only.

In 2013, Ulloa worked on replacing city streetlights.  That job involved digging about five feet down, pouring cement, setting up anchor bolts, assembling the light poles, and then connecting the light poles to the electric grid.

In 2016 and 2017, Ulloa worked primarily on two projects: the Ameron project and the Mobilitie project.  The Ameron project involved installing and replacing streetlights, and it was managed by acting foreman Frank Niels and general foreman Angel Marquez.  The Mobilitie project involved installing small cell towers (antennas) on streetlights, and it was managed by foreman Andres (Andy) Contreras and general foreman Angel Marquez.  Both projects were renewed on a yearly basis, and were some of the few jobs SASCO did that involved outside wiring.

### C. Ulloa's heart attack, return to work, and termination.

Ulloa had a heart attack in October 2018. He had surgery to implant a heart stent and was out of work on a medical leave of absence for about two months, returning to work on December 9, 2018.

Prior to Ulloa's return to work, project engineer April Benson told Ulloa that SASCO was "slow right now, so you won't have full weeks until after the new year." Benson inquired: "Do you want to stay on disability until after the new year? So you get full pay? [¶] It [d]oesn't matter to us. It's up to you." Ulloa responded that he had already submitted his disability paperwork and preferred to return to work December 9. Benson said: "OK.[] Next week, we have an equipment install Monday, Tuesday, and Wednesday. Right now Thursday and Friday no work."

Effective December 9, 2018, Ulloa's doctor released Ulloa back to work without limitations. Ulloa testified that he did not request any accommodations when he returned to work because he was able to perform all the work his job required and he "knew the company doesn't do any light duty work." Project manager Mark Smith similarly testified that SASCO did not offer light duty work to field employees. Smith explained: "[U]nless the field employee is a-hundred percent capable of performing their job, we don't really have any work for them. . . . [I]t's – it's a safety concern, you know, that the guys need to be able to do their task. We don't want to have anybody get hurt or hurt anyone else . . . by not being a-hundred percent capable."

Ulloa was placed back on the Mobilitie project upon his return to work, working on a two-person crew with electrician

apprentice Edgar Alvarez.  One other crew was assigned to the Mobilitie project, staffed by an unidentified journeyman electrician and electrician apprentice Alberto Paz.

In late February 2019, Smith decided to lay off one of the two crews assigned to the Mobilitie project because the project was nearly finished.  It was left to superintendent Jack Ivy and general foreman Angel Marquez to determine which crew would be laid off.  Marquez chose Ulloa and Alvarez for termination, in consultation with their direct supervisor, foreman Andres Contreras.  Ivy testified that Ulloa and Alvarez were terminated because there were just a few Mobilitie sites left to finish and "the crew that [Ulloa] and [Alvarez] were on, their crew, the poles that they were doing in their area were finished and there was no more work for them.  The other crew was going to finish the other sites and the [Mobilitie] project was then ended."  Contreras similarly testified that he recommended Ulloa and Alvarez for termination because the Mobilitie project was ending and because Ulloa had been insubordinate by seeking work from other divisions of the company without Contreras's permission.

Ulloa and Alvarez were notified of their termination on February 28, 2019, approximately two and a half months after Ulloa's return from medical leave.  At the time of their termination, Ulloa was 56 years old and Alvarez was 35 years old.  Ulloa's termination notice said Ulloa was terminated due to a reduction in force and was "[e]ligible for rehire."

After Ulloa was terminated, the other Mobilitie crew spent a few weeks completing the remaining installations.  Those crew members then were transferred to other projects.

Ulloa's last day of work was February 28, 2019.  He left his union in about October 2019.

## II. The present action.

In April 2020, Ulloa filed a sixteen-count complaint against SASCO, alleging: (1) discrimination based on age and disability in violation of the Fair Employment and Housing Act (FEHA; Gov. Code, § 12940 et seq.); (2) retaliation in violation of FEHA; (3) failure to prevent discrimination and retaliation in violation of FEHA; (4) failure to provide reasonable accommodation in violation of FEHA; (5) failure to engage in the interactive process in violation of FEHA; (6) retaliation in violation of the California Family Rights Act (CFRA; Gov. Code, § 12945.2); (7) declaratory relief; (8) wrongful termination in violation of public policy; (9–10) retaliation in violation of Labor Code sections 98.6 and 1102.5; (11–15) wage and hour violations; and (16) waiting time penalties.

In brief, the complaint alleged that prior to Ulloa's medical leave, his work performance had never been called into question. After Ulloa returned to work in December 2019, his supervisors would tell him, " 'You are too slow,' " " 'You are like an old timer,' " and " 'You need to work faster.' " Ulloa was terminated less than three months later. Ulloa learned after his termination that he had been replaced by someone significantly younger. The complaint also alleged that Ulloa was not paid overtime, was not allowed to take meal and rest breaks, and was not furnished wage statements.

## III. SASCO's motion for summary judgment.

### A. SASCO's motion.

SASCO filed a motion for summary judgment or adjudication in May 2021. As to Ulloa's discrimination and retaliation claims, SASCO asserted that it had a legitimate,

nondiscriminatory reason for terminating Ulloa—namely, that the Mobilitie project was ending and SASCO needed fewer outdoor electricians. SASCO further asserted that Ulloa could not establish that its asserted reason for terminating him was a pretext for age or disability discrimination because (1) Ulloa was 51 years old when he was hired, and thus his termination at age 56 was not probative of age discrimination; (2) Alberto Paz, the employee Ulloa claimed replaced him, was hired in 2017, nearly two years before Ulloa's termination, and Paz was an electrician apprentice, not a journeyman; (3) any stray remarks about Ulloa's age were not causally connected to his termination; (4) Ulloa was granted medical leave after his heart attack and was able to do his job without accommodations when he returned; and (5) Ulloa never requested an accommodation or engaged in the interactive process. As to Ulloa's wage and hour claims, SASCO asserted that it paid Ulloa all the overtime he was due, provided Ulloa with required meal and rest break and itemized wage statements, and did not owe Ulloa any waiting time penalties. Finally, SASCO asserted that no evidence supported Ulloa's punitive damages claim.

In support of its motion for summary judgment, SASCO submitted the following evidence:

● Most of SASCO's work involved inside wiring, which Ulloa was not licensed to do. The Ameron and Mobilitie projects, which were renewed on a yearly basis, were some of the few jobs that involved outside wiring.

● In 2018 and 2019, SASCO's outdoor wiring work was seasonal. Projects typically were paused at the end of the calendar year and did not pick up again until late spring.

7

● SASCO hired electricians through the local union hall. Once a job was completed, employees were either moved to other jobs, put on unpaid leave, or given reduction-in-force termination slips that would allow the employees to go back to the union hall and "sign the book"—i.e., get on a list for new jobs. If a work slow-down was temporary, SASCO generally would allow an employee to choose between unpaid leave or termination. But if a work slow-down was more permanent because a job was ending, employees would be terminated without being given the choice to take unpaid leave.

● At the end of 2018, there were three journeymen electricians working on the Mobilitie project: foreman Andres Contreras, Ulloa, and an unnamed journeyman. Other journeymen electricians were working on the Ameron project and the SCE LED replacement project. After Ulloa's termination, SASCO retained about 10 journeymen electricians to work on those projects. The journeymen included Juan Olivos, who was about Ulloa's age, and Daniel Rios, who was in his mid-thirties. The company also retained electrician apprentice Alberto Paz, who was later promoted to journeyman.

● The Mobilitie project was completed in about March 2019. Once the Mobilitie project was completed, SASCO needed fewer outdoor electricians.

● Ulloa admitted at his deposition that when he returned to work after his heart attack, he was able to do all the work his job required and he did not request an accommodation. Further, Ulloa's doctor's note said Ulloa was eligible to return to work at full capacity.

● Ulloa's termination notice or "pink slip" said Ulloa was terminated due to a reduction in force and was eligible for rehire.

● Ulloa never complained to SASCO about any kind of harassment, discrimination, retaliation, or unsafe work conditions.

● Ulloa testified at his deposition that he believed he was discriminated against based on his age and disability because he was replaced by Paz, who was younger than Ulloa. In fact, no one was hired to replace Ulloa: Paz was hired as an apprentice in August 2017, more than 18 months before plaintiff was terminated, and he became a journeyman electrician through the union's apprenticeship program more than three months after Ulloa was terminated.

● Ulloa was properly paid for all of his work, including overtime, was provided with required meal breaks, and received accurate itemized wage statements. He never complained otherwise.

● Ulloa was chosen for termination because the Mobilitie project was ending and because when he was told to stay home because there was no work, he would work in another division without his supervisor's permission.

## B.      Ulloa's opposition.

Ulloa opposed the motion for summary judgment. In support, he submitted his own declaration and deposition testimony, in which he said as follows:

● From 2013 until his termination in 2019, foreman Frank Niels "harassed, discriminated, and retaliated against [Ulloa] due to his age" by telling Ulloa he was " 'super slow' " and " ' had to pick up the pace' " or SASCO would lay him off and " 'bring in somebody faster.' " Niels retaliated against Ulloa by requiring him to do manual labor, including jack hammering concrete, that was outside his job description.

● Ulloa began working under foreman Andres Contreras in about 2017. In 2017 or 2018, SASCO hired Paz, who was much younger than Ulloa. At about that time, Contreras started giving Paz more work and cutting back Ulloa's hours. Contreras also started pressuring Ulloa to work faster. Contreras would tell Ulloa he was "too slow" and should " 'pick up the pace' " or he would be fired. Ulloa complained to Angel Marquez, but nothing was done. Contreras also told Ulloa that he was "too old" and was "an old-timer and too slow."

● Ulloa's hours were reduced substantially when he returned to work after his heart attack. In the two-and-a-half months between Ulloa's return to work and his termination, there was only one week in which he worked 40 or more hours. When Ulloa complained to Contreras, Contreras would say, " '[T]here is no work right now.' "

● When Ulloa returned to work after his heart attack, he told Contreras that he was "not the same as before and that because of [his] heart condition [he] would need to work at a slower pace." Ulloa also told Contreras that he "[did] not have the same endurance or strength . . . so [he would] need to take some additional time to complete tasks and that [his] health comes first." Instead, Contreras "began to put additional pressure on [him] by telling [him] that [he is] too slow and that [he] need[s] to work faster. [Ulloa] would complain to him and would remind him that [he] just had a heart attack and that [he] need[s] to take [his] time to perform [his] tasks. In response, Andres Contreras would tell [him] 'Go with the flow. If you don't like it go find another job.' "

● There had been slowdowns and fluctuations in work throughout Ulloa's tenure at SASCO, but during previous

10

slowdowns, SASCO would send Ulloa home and have him wait until there was more work.  In February 2019, however, SASCO terminated Ulloa without giving him the opportunity to take leave without pay, and his termination documents stated that he was not eligible for rehire.

●  The CBA provided that when laying off employees due to lack of work, employers should lay off employees in order of seniority, with the most senior electricians being laid off last.  Ulloa was a Group I electrician, and thus he should have been among the last to be laid off due to lack of work.

●  The allegations of insubordination were false.  The only times Ulloa came to work when it was raining was prior to his heart attack, that only happened a couple of times, and no one ever told him not to come to work under those circumstances.

●  Based on Albert Paz's age, Contreras's statements to Ulloa, and Contreras's "indifference" to Ulloa's complaints, Ulloa believed his hours were reduced, his work assigned to Paz, and he was terminated because of his age, heart attack, "ongoing heart condition and disability," his "need to work slower," and his medical leave.

Contreras admitted in his deposition that he might have called Ulloa an "old timer" once or twice "in the aspect of not fitting with the work habits.  In other words, if I could put it this way, that generational gap between the way the old time people used to work, meaning back in the days, the days that they would work, meaning it was a different breed[.]  I guess if you could put it that way where, not to get too much into it, but, you know, today's generation of workers aren't like the workers were back in the day."

### C. Order granting summary adjudication.

The trial court granted SASCO's motion for summary adjudication as to each cause of action except the sixteenth cause of action for waiting time penalties. The trial court found as follows:

First, as to the causes of action for age and disability discrimination, retaliation, wrongful termination, and declaratory relief, SASCO articulated a legitimate, nondiscriminatory reason for terminating Ulloa—namely, that the Mobilitie project was ending, Ulloa's crew would be finished with its work by the end of February 2019, and Ulloa had been insubordinate. In response, Ulloa did not raise a triable issue that he was subjected to an adverse employment action because of his age or disability.

Second, as to the failure to accommodate and interactive process claims, the evidence was undisputed that Ulloa did not seek an accommodation and was able to perform all of the tasks assigned to him without accommodations. Thus, there were no triable issues as to SASCO's duty to reasonably accommodate Ulloa or to engage in the interactive process with him.

Third, as to the wage and hour claims, there were no triable issues that SASCO failed to pay Ulloa overtime, failed to provide meal and rest breaks, failed to pay wages due, or failed to furnish wage and hour statements.

Finally, there were no triable issues that SASCO acted with fraud, malice, or oppression.

Ulloa voluntarily dismissed the sixteenth cause of action for waiting time penalties on April 20, 2023, and the trial court entered judgment for SASCO on May 22, 2023. Ulloa timely appealed from the judgment.

12

## DISCUSSION

Below, Ulloa opposed SASCO's motion for summary judgment or adjudication as to each cause of action. On appeal, however, Ulloa has challenged the judgment only as to his discrimination and retaliation claims (first through tenth causes of action) and his request for punitive damages.[1]

Summary judgment or summary adjudication is properly granted when there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subds. (c), (f)(1).) A defendant moving for summary judgment or adjudication bears the initial burden of showing that one or more elements of the plaintiff's cause of action cannot be established or there is a complete defense. (*Id.*, § 437c, subd. (p)(2).) If the defendant meets this burden, the plaintiff must then demonstrate a triable issue of material fact. (*Ibid.*)

We review the trial court's summary adjudication ruling de novo. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860 (*Aguilar*).) In performing our review, we view the evidence in the light most favorable to Ulloa, liberally construing his evidence while strictly scrutinizing SASCO's showing and resolving any evidentiary doubts or ambiguities in Ulloa's favor. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768–769.)

---

[1] Because plaintiff does not assert error as to the eleventh through fifteenth causes of action, we deem those claims abandoned. (*Kabat v. Department of Transportation* (2024) 107 Cal.App.5th 651, 661, fn. 4 [theories advanced in opposition to summary judgment at trial level that are not raised on appeal are deemed abandoned].)

Nonetheless, Ulloa's evidence "remains subject to careful scrutiny. [Citation.] We can find a triable issue of material fact 'if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.' (*Aguilar*, at p. 850.)" (*King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 433 (*King*).)

## I.      Preliminary issues.

We begin by addressing SASCO's contention that Ulloa forfeited his appellate claims by failing to include record citations throughout his opening brief, instead relying on defined terms. SASCO also moves to strike Ulloa's Notice of Errata, filed on October 24, 2024, which added embedded record citations to previously defined terms.

We share SASCO's frustration with Ulloa's counsel's reliance on defined terms and string cites to the record, which significantly complicated our review of Ulloa's briefs, evidence, and arguments. We therefore admonish Ulloa's counsel not to use this format in any future appeals. Nonetheless, we will deny the motion to strike and reject SASCO's request that we deem Ulloa's contentions forfeited. (Cal. Rules of Court, rule 8.204(e)(2)(C).)

Separately, we reject Ulloa's contention that the trial court erred by denying his request for judicial notice of a three-page summary of an article discussing the characteristics of a non-ST-elevation myocardial infarction—that is, a heart attack caused by the partial blockage of a coronary artery. (See NSTEMI: Non-ST-Elevation Myocardial Infarction (Heart Attack) <https://my.clevelandclinic.org/health/diseases/22233-nstemi-heart-attack> [as of Aug. 28, 2025], archived at

14

<https://perma.cc/4CMM-QK2F >.)  Ulloa has not explained why he believes the article summary was relevant to any of the legal issues raised by SASCO's motion for summary judgment, and thus he has not demonstrated that it was a proper subject of judicial notice.  (See *California Healthcare & Rehabilitation Center v. Baass* (2025) 109 Cal.App.5th 553, 558, fn. 3 [judicial notice is confined to those matters that are relevant]; *Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison* (1998) 18 Cal.4th 739, 748, fn. 6 [denying requests for judicial notice where "the requests present[ed] no issue for which judicial notice of these items [wa]s necessary, helpful, or relevant"].)  Further, Ulloa made no showing that the exclusion of this document was prejudicial.  We therefore find no reversible error.  (See *We Advocate Thorough Environmental Review v. City of Mount Shasta* (2022) 78 Cal.App.5th 629, 638 [exclusion of documents requires reversal only if the exclusion is prejudicial].)

Having resolved these preliminary issues, we now consider whether there are triable issues of material fact as to the first through tenth causes of action.

## II.  FEHA discrimination and retaliation claims (first, second, and sixth causes of action).

Ulloa's first cause of action alleges discrimination on the basis of age and disability in violation of FEHA.  The second and sixth causes of action allege retaliation for taking medical leave in violation of FEHA and CFRA.  We find no triable issues as to these causes of action, as we discuss.

### A.  Legal standards.

FEHA prohibits an employer from discriminating against an employee because of age and physical disability and from

15

retaliating against an employee for engaging in protected activity, such as requesting medical leave. (Gov. Code, § 12940, subds. (a), (m)(2).) Similarly, the CFRA prohibits retaliation against an employee for exercising the right to take protected medical leave. (*Id.*, § 12945.2, subd. (k)(1).)

To establish a claim for discrimination under FEHA or for retaliation under FEHA or the CFRA, a plaintiff must prove that: (1) he was a member of a protected class or engaged in protected activity; (2) he suffered an adverse employment action; and (3) the employer acted with a discriminatory or retaliatory motive. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 355 (*Guz*) [FEHA discrimination claim]; *Choochagi v. Barracuda Networks, Inc.* (2020) 60 Cal.App.5th 444, 460 [FEHA retaliation claim]; *Rogers v. County of Los Angeles* (2011) 198 Cal.App.4th 480, 491 [CFRA retaliation claim].) A plaintiff need only demonstrate that discrimination was a substantial motivating factor in the adverse employment decision, not the sole motive. (*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 232.)

A defendant moving for summary judgment has an initial burden to make a prima facie showing that the plaintiff cannot establish one or more elements of his causes of action or that there is a complete defense. (Code Civ. Proc., § 437c, subds. (f)(1), (o), (p)(2); *Aguilar*, *supra*, 25 Cal.4th at pp. 850–851.) In an employment discrimination or retaliation case, an employer moving for summary judgment can meet its initial burden by introducing evidence either that one or more elements of plaintiff's case is lacking or that the adverse employment action was based upon legitimate, nondiscriminatory factors. (*Zamora v. Security Industry Specialists, Inc.* (2021) 71 Cal.App.5th 1, 32 (*Zamora*).) If the employer satisfies its initial burden, "it ' " 'will

16

be entitled to summary [judgment or adjudication] *unless the plaintiff produces admissible evidence which raises a triable issue of fact material to the defendant's showing.'"'"* (*Ibid.*) To raise a triable issue, the plaintiff may establish discriminatory motive either by direct evidence or by attacking the employer's proffered reasons as pretexts for discrimination. (*Ibid.*) Summary judgment is properly granted only "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).)

### B. Analysis.

Below, SASCO presented evidence that Ulloa was terminated because the Mobilitie project was ending and the company needed to lay off a crew; Ulloa and Alvarez had completed their scope of work, while the other Mobilitie crew had a few jobs left to finish; and Ulloa had been insubordinate. These are legitimate, nondiscriminatory reasons for the termination and were sufficient to shift the burden back to Ulloa to demonstrate unlawful discrimination. (See *Foroudi v. The Aerospace Corp.* (2020) 57 Cal.App.5th 992, 1008 (*Foroudi*) [evidence that employer instituted a company-wide reduction in force after learning it faced potentially severe cuts to its funding and used standardized criteria to select employees for termination was sufficient to satisfy employer's summary judgment burden]; *Martin v. Lockheed Missiles & Space Co.* (1994) 29 Cal.App.4th 1718, 1731–1732 [employer met its summary judgment burden by producing evidence that employee was terminated as part of a company-wide reduction-in-force].)

In response, Ulloa points to evidence that he contends suggests a discriminatory motive for his termination. None of

17

plaintiff's evidence raises a triable issue of material fact, as follows.

First, Ulloa asserts that a younger, nondisabled employee, Alberto Paz, was brought in to replace him. The record does not support this contention. Paz was hired in August 2017, more than a year and a half before Ulloa was terminated. Paz was hired in a different job classification—as an apprentice, not a journeyman electrician. While Paz ultimately was elevated to a journeyman electrician, this did not occur until many months after Ulloa was terminated, and it happened under the union's auspices, not SASCO's. Further, the record does not support Ulloa's contention that his hours were reduced when Paz was hired. The only evidence that Ulloa's hours were reduced was Ulloa's own testimony that after Contreras "brought in the young kid," Contreras "started taking work away from [Ulloa]." But Ulloa's testimony is inconsistent with his time sheets, which showed that he worked approximately 40 hours nearly every week between August and December 2017; he worked fewer than 40 hours per week in January, February, and March 2018; and he worked at least forty hours per week during most weeks between April and October 2018. On this record, Ulloa's unsupported observations do not raise a triable issue. (See *Foroudi*, *supra*, 57 Cal.App.5th at p. 1010 [plaintiff's "limited personal observations" that he had never observed an employee over 60 years of age being promoted "have minimal probative value and are far too weak to raise an inference of discrimination"]; *King*, *supra*, 152 Cal.App.4th at p. 433 [plaintiff's subjective beliefs in an employment discrimination case do not create a genuine issue of fact].)

18

Second, Ulloa asserts that SASCO violated the CBA's reverse layoff policy, which dictated that he, a Group I journeyman electrician, "should have been among the last to be laid off or terminated." Not so. Although it is undisputed that Ulloa was a Group I journeyman electrician and that the CBA provided that Group I employees should be laid off after employees in Groups II thru IV, there is no evidence of the classifications of any of the journeymen electricians whom SASCO retained when it terminated Ulloa. Specifically, there is no evidence that any of the journeymen electricians SASCO retained had less seniority than Ulloa within the meaning of CBA's reverse layoff policy. In any event, Ulloa's opposition to SASCO's motion for summary judgment expressly disclaimed any reliance on the CBA as a basis for liability under FEHA, stating: "Plaintiff clarifies that none of his causes of action are based on the CBA or require this Court to interpret the CBA."

Third, Ulloa asserts the Mobilitie project continued after his termination and other journeymen electricians were hired to complete it. In fact, SASCO witnesses consistently testified that when Ulloa was terminated, the Mobilitie project was nearly completed; there were just a few sites left to do, all in the geographical region where the other crew was working; and the project was completely finished just a few weeks later. There was, moreover, no evidence that any electricians were hired to work on the Mobilitie project after Ulloa was terminated. To the contrary, SASCO's witnesses testified that *no* electricians worked on the Mobilitie project after about March 2019. Further, while Jack Ivy testified at his deposition that SASCO was planning to hire more journeymen electricians, he gave this testimony in April 2021, more than two years after Ulloa was terminated.

19

This testimony does not reasonably suggest that SASCO hired someone to replace Ulloa in *February 2019*.

Fourth, Ulloa asserts that in February 2019, there was "no reduction in force in real terms." The only evidence Ulloa cites in support is Jack Ivy's testimony about the number of people Ivy *personally* supervised in late 2018 and early 2019. This testimony facially addressed Ivy's supervisory responsibilities, not SASCO's workforce, and it therefore does not support the conclusion that SASCO did not reduce the size of its workforce in February 2019.

Fifth, Ulloa asserts that his termination was not a true reduction in force because a Field Check Information Request dated February 27, 2019 identified Ulloa as ineligible for rehire. We do not agree that this document raises a triable issue that Ulloa's termination was not part of a reduction-in-force. Project manager Mark Smith testified that when plaintiff was terminated, plaintiff and the union were given the signed termination notice dated February 28, 2019 that stated Ulloa was eligible for rehire, *not* the unsigned February 27 request that said he was not. Smith testified, moreover, that Ulloa "was eligible for rehire." Ulloa provided no evidence to suggest that he was not eligible for rehire or that SASCO gave him or the union the February 27 Field Check Information Request. To the contrary, Ulloa testified that he was put back on "roll call" with the union after SASCO terminated him.

Sixth, Ulloa asserts that none of the younger electricians assigned to the Mobilitie project were terminated when the project ended, but instead were moved to the Ameron project. In fact, the undisputed evidence was that in February 2019, five electricians were assigned to the Mobilitie project: (1) foreman

Andres Conteras (age unknown); (2) Ulloa (age 56); (3) an unidentified journeyman electrician (age unknown); (4) apprentice Edgar Alvarez (age 35); and (5) apprentice Alberto Paz (age 35). Ulloa and Alvarez were laid off, while Contreras, Paz, and the unidentified journeyman were kept on. SASCO's decision to terminate a 35-year-old and a 56-year-old, while retaining another 35-year-old and two other employees whose ages are unknown, manifestly is not evidence of age discrimination. (See *Foroudi*, *supra*, 57 Cal.App.5th at p. 1010 [plaintiff who was laid off as part of a company-wide reduction in force "would have to show that younger employees with comparable issues, and who were otherwise similarly situated, were not selected for the RIF" to demonstrate a triable issue as to age discrimination]; *Beale v. GTE California* (C.D. Cal. 1996) 999 F.Supp. 1312, 1323 [plaintiffs failed to establish prima facie case of age discrimination; although there was evidence that most of the employees who were laid off were over 40 years old, there was no evidence of the ages of the employees who were not laid off].) Nor is there evidence that all of the journeymen electricians who were retained after Ulloa was terminated were younger than Ulloa. The only journeymen electricians identified in the record who continued to work at SASCO after Ulloa was terminated were Juan Olivos, who was about Ulloa's age, and Daniel Rios, who was in his mid-thirties. The retention of these electricians when Ulloa was laid off does not raise an inference of discrimination. (See *Guz*, *supra*, 24 Cal.4th 317 at p. 368 [although it is not dispositive that plaintiff's duties were assigned to an older worker after plaintiff's termination, "that fact significantly *undermines* any suspicion that chronological age influenced [plaintiff's] dismissal"].)

21

Seventh, Ulloa asserts that Contreras provided inconsistent explanations for recommending Ulloa's termination, and that Contreras's suggestion that Ulloa was insubordinate was pretextual because no SASCO rule prevented Ulloa from working in another division when there was no field work. We see no inconsistency in Contreras's testimony: Contreras testified that he recommended Ulloa for termination because there was a need to lay off one crew *and* because Ulloa had been insubordinate. The relevant issue, therefore, is not whether Ulloa's alleged insubordination would have supported a termination for cause, but rather whether, in light of SASCO's need to reduce its work force, Contreras properly considered Ulloa's alleged insubordination in deciding whom to lay off. (See, e.g., *Foroudi, supra,* 57 Cal.App.5th at p. 1010 ["because [plaintiff] was laid off as part of a company-wide reduction in force, the fact that he was terminated for minor issues alone does not raise an inference of age discrimination"].) Ulloa cites no authority for the proposition that under the circumstances, Ulloa's alleged insubordination was an improper consideration, and the law is to the contrary. (See *Guz, supra,* 24 Cal.4th at p. 358 ["if nondiscriminatory, [employer's] true reasons need not necessarily have been wise or correct"]; *Horn v. Cushman & Wakefield Western, Inc.* (1999) 72 Cal.App.4th 798, 807 ["Nor can the employee simply show the employer's decision was wrong, mistaken, or unwise. Rather, the employee ' "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence' " ' "].)

Eighth, Ulloa asserts that his layoff was inconsistent with SASCO's general practice of allowing employees to opt for unpaid time off rather than termination during work slow-downs. But there was no evidence that employees were always allowed to make such a choice. To the contrary, Jack Ivy testified that while employees were sometimes given the choice to take unpaid time off during a work slow-down, that choice was not offered when projects were ending. He said: "When [a] project's over and there's no future work in that project, those people are terminated." Ulloa offered no evidence to the contrary.

Ninth, Ulloa asserts that foreman Frank Niels retaliated against Ulloa by requiring him to do extensive manual labor, including jackhammering concrete, that was outside his job description. But Ulloa testified at his deposition that the concrete work began in 2017 as part of a job that required electricians to do "intensive labor." Ulloa did not request medical leave until October 2018, more than a year after he was allegedly assigned to the concrete work. That work thus could not have been in retaliation for Ulloa's "protected activit[y] of taking medical leave during his employment with [SASCO]."

Finally, Ulloa asserts that statements made by foremen Frank Niels and Andres Contreras constitute direct evidence of age-related bias. With regard to foreman Frank Niels, Ulloa testified that Niels frequently criticized the speed at which Ulloa worked, telling Ulloa that he was " 'super slow' " and had to " 'pick up the pace' " or SASCO would " 'bring in somebody faster.' " There is no evidence that Niels ever suggested that Ulloa worked slowly *because of his age*, nor is it reasonable to assume, in the absence of any evidence, that Niels believed workers in their fifties work more slowly than younger workers.

In any event, nothing in the record suggests that Niels played a part in the decision to terminate Ulloa.

Foreman Andres Contreras's statements to Ulloa present a closer case. Ulloa testified that Contreras told him on more than one occasion that he was " 'too old' " and was " 'an old-timer and too slow,' " and Contreras admitted that "might have" told Ulloa he was "like an old timer . . . [i]n the aspect of not fitting with the work habits." While these comments arguably reveal some age-related bias, they are actionable only if there is evidence of a causal relationship between the asserted bias and the adverse employment action. (*DeJung v. Superior Court* (2008) 169 Cal.App.4th 533, 550 (*DeJung*); *Trop v. Sony Pictures Entertainment, Inc.* (2005) 129 Cal.App.4th 1133, 1148.) Ulloa proffered no such evidence.

Plaintiff contends the present case is analogous to *DeJung, supra*,169 Cal.App.4th 533, but we disagree. In *DeJung*, the plaintiff testified that he was told he was not offered a full-time position because the hiring committee " 'want[ed] somebody younger, maybe in their 40's.' " (*Id.* at p. 540.) The Court of Appeal concluded that this remark created a triable issue as to age discrimination because it was evidence "of a causal relationship between [age related] animus and the adverse employment action." (*Id.* at p. 550.) Here, in contrast, there is no evidence linking Contreras's alleged comments about Ulloa's age to the termination decision. At best, the comments were stray remarks that are not sufficient to avoid summary adjudication. (See *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 541 ["A stray remark alone may not create a triable issue of age discrimination"]; see also *Nidds v. Schindler Elevator Corp.* (9th Cir. 1996) 113 F.3d 912, 918, 919 [supervisor's " 'old timers' "

24

comment "is weak evidence and not enough to create an inference of age discrimination"].)

For all the foregoing reasons, we conclude there were no triable issues of fact as to plaintiff's claims for discrimination and retaliation based on age and disability. We therefore affirm the grant of summary adjudication of the first, second, and sixth causes of action.

## III. Failure to prevent FEHA discrimination and retaliation (third cause of action).

Ulloa's third cause of action alleges failure to prevent discrimination or retaliation in violation of Government Code section 12940, subdivision (k). The elements of this claim are: (1) the plaintiff was subjected to discrimination or retaliation; (2) the defendant failed to take all reasonable steps to prevent discrimination or retaliation; and (3) this failure caused the plaintiff harm. (*Caldera v. Department of Corrections and Rehabilitation* (2018) 25 Cal.App.5th 31, 43–44 (*Caldera*); CACI No. 2527.)

There can be no liability for failing to prevent discrimination or retaliation "unless actionable [discrimination or retaliation] occurred." (*Caldera, supra,* 25 Cal.App.5th at p. 44; see also *Jumaane v. City of Los Angeles* (2015) 241 Cal.App.4th 1390, 1410 [predicate for failure to prevent discrimination, retaliation, or harassment "is substantial evidence of discrimination, retaliation and harassment"].) Accordingly, because there are no triable issues as to actionable discrimination or retaliation under FEHA, Ulloa's cause of action for failure to prevent discrimination and retaliation also necessarily fails.

25

## IV. Failure to accommodate and to engage in the interactive process (fourth and fifth causes of action).

FEHA requires employers to provide reasonable accommodation for an employee's "known physical or mental disability" unless doing so would produce undue hardship. (Gov. Code, § 12940, subd. (m)(1).) Employers must also engage in a timely, good faith interactive process to determine effective reasonable accommodations for known disabilities. (Gov. Code, § 12940, subd. (n).)

We agree with the trial court that there are no triable issues of fact as to Ulloa's reasonable accommodation claim. As defined by FEHA, a physical disability is a "physiological disease, disorder, [or] condition" that affects one or more enumerated body systems (neurological, immunological, musculoskeletal, respiratory, cardiovascular, reproductive, digestive, genitourinary, hemic, lymphatic, skin, or endocrine) *and limits a major life activity*. (Gov. Code, § 12926, subd. (m)(1).) " 'The term 'major life activity' is broadly construed, and includes physical and social activities and working. (§ 12926, subd. (m)(1)(B)(iii).)' " (*Allos v. Poway Unified School District* (2025) 112 Cal.App.5th 822, 836.)

Here, it is undisputed that Ulloa suffered from heart disease, which can constitute a disability under FEHA. (See Gov. Code, § 12926.1, subd. (c) [physical disabilities include heart disease].) But while Ulloa's heart disease unquestionably was disabling for a period of time after his October 2018 heart attack, Ulloa presented no evidence that his heart disease continued to limit any major life activity after his heart surgery and recovery. To the contrary, it is undisputed that Ulloa's doctor released him

to work at "full capacity" as of December 9, 2018.  Further, Ulloa testified at his deposition he did not need or request any accommodations when he returned to work, and that he was "able to do all of the tasks [he was] required to do" without any accommodations.

On appeal, Ulloa urges that there are triable issues as to his reasonable accommodation claim because he stated in his declaration that when he returned to work in December 2018, he told Contreras that he would need to work at a slower pace because of his heart condition.  But Ulloa's statement in his declaration flatly contradicts his prior deposition testimony that he neither sought nor required any accommodations.  A party cannot create a triable issue of fact with a declaration that contradicts his earlier deposition testimony.  (*Gharibian v. Wawanesa General Ins. Co.* (2025) 108 Cal.App.5th 730, 739; *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 21–23.)  Ulloa thus did not raise a triable issue as to his reasonable accommodation claim.

We reach the same conclusion with regard to Ulloa's interactive process claim.  To establish a claim for failure to engage in the interactive process under FEHA, a plaintiff must show:  (1) the employee had a disability that was known to the employer; (2) the employee requested accommodation or the employer recognized the need for accommodation; (3) the employer failed to engage in a good faith interactive process to determine effective reasonable accommodations; and (4) the employee could have been reasonably accommodated had the employer engaged in the process.  (*Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1013; *Nadaf-Rahrov v. Neiman Marcus Group, Inc.* (2008) 166 Cal.App.4th 952, 975.)  As

27

we have said, Ulloa did not raise a triable issue that he had a qualifying disability because there is no evidence that his heart disease limited any major life activity. Further, Ulloa conceded that he never requested an accommodation. Ulloa therefore did not raise a triable issue as to his interactive process claim.

## V. Declaratory relief and wrongful termination claims (seventh and eight causes of action).

Ulloa's seventh cause of action seeks a declaratory judgment that SASCO terminated him due to his age, perceived disability, and engagement in protected activities. Ulloa's eighth cause of action alleges wrongful termination in violation of the public policies articulated in FEHA and the CFRA.

The seventh and eighth causes of action are wholly derivative of Ulloa's discrimination and retaliation claims because both depend on evidence of unlawful discrimination and retaliation. Specifically, to establish a declaratory relief claim, a plaintiff must demonstrate an actual controversy relating to the legal rights and duties of the respective parties. (Code Civ. Proc., § 1060.) Ulloa's complaint seeks a declaratory judgment that that SASCO violated its rights and duties under FEHA by terminating him based on his age and disability. Our conclusion that there are no triable issues as to Ulloa's FEHA claims, accordingly, are also dispositive of his declaratory relief claim.

The elements of a claim for wrongful termination in violation of public policy are: (1) an employer-employee relationship; (2) termination or constructive discharge; (3) the termination violated public policy; and (4) the termination caused harm. (*Garcia-Brower v. Premier Automotive Imports of CA, LLC* (2020) 55 Cal.App.5th 961, 973.) A cause of action for wrongful termination in violation of public policy, where based on alleged

FEHA violations, "rises and falls with those claims" on summary judgment. *(Zamora, supra,* 71 Cal.App.5th at p. 62.)  Because there are no triable issues of material fact with respect to Ulloa's FEHA claims, summary judgment was properly granted as to Ulloa's claim for wrongful termination in violation of public policy.

## VI. Labor Code retaliation claims (ninth and tenth causes of action).

The ninth and tenth causes of action allege retaliation in violation of Labor Code sections 98.6 and 1102.5.[2]  Specifically, these causes of action allege that Ulloa was terminated because he "routinely complained to his supervisors that he was not able to take meal and rest breaks and that he and his coworkers were not being compensated all their overtime premiums."

Ulloa challenges the grant of summary adjudication of the ninth and tenth causes of action, but his appellate briefs do not identify any evidence that he complained to supervisors that he was not permitted to take meal and rest breaks or that he and his coworkers were not compensated for overtime.  He also does not explain why such complaints would be actionable under Labor Code sections 98.6 and 1102.5, nor does he identify any evidence linking the alleged complaints to his termination.

---

[2]  Labor Code section 98.6 prohibits an employer from retaliating against an employee for exercising a right under the Labor Code.  Labor Code section 1102.5 prohibits an employer from retaliating against an employee for reporting a violation of law to a government or law enforcement agency, a public investigatory body, or a person with authority to investigate or correct the violation.

"[I]t is a fundamental principle of appellate procedure that a trial court judgment is ordinarily presumed to be correct and the burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment." (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609.)  Consequently, an assertion may be deemed forfeited where it is not supported by any citation to the record.  (*WFG National Title Ins. Co. v. Wells Fargo Bank, N.A.* (2020) 51 Cal.App.5th 881, 894.)  "It is not our role to scour the record to find evidence to support [appellant's] contention or create a triable issue of fact.  (*Helm v. City of Los Angeles* (2024) 101 Cal.App.5th 1219, 1228, fn. 5.)  Because Ulloa's contention that the trial court erred by summarily adjudicating the ninth and tenth causes of action is not adequately supported by legal analysis and citations to the record, we deem these contentions forfeited.

## VII.  Conclusion.

For all the foregoing reasons, there are no triable issues of material fact precluding summary judgment as to any cause of action alleged in the complaint.  Further, in light of this conclusion, it is unnecessary to address Ulloa's claim for punitive damages.  (See *Coleman v. Gulf Ins. Group* (1986) 41 Cal.3d 782, 789, fn. 2 [court need not address claim for punitive damages if there is no support for any substantive claim]; *King, supra,* 152 Cal.App.4th at p. 444 [claim for punitive damages moot when summary judgment on underlying claims affirmed].)  We therefore affirm the judgment.

## DISPOSITION

The judgment is affirmed.  Respondent SASCO is awarded its appellate costs.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

EGERTON, J.

KLATCHKO J.*

---

\*      Judge of the Riverside County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.